ILLINOIS WATER SERVICE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 100404.   Promulgated December 24, 1943.

*Francis L. Casey, Esq., Richard H. Appert, Esq.*, and *Russell D. Morrill, Esq.*, for the petitioner.
*Z. N. Diamond, Esq.*, for the respondent.

HARRON, *Judge*: The respondent determined a deficiency in income tax for the taxable years 1935 and 1936 in the respective amounts of $2,312.48 and $2,562.63.

The main question, involving the determination of annual depreciation allowance, is whether respondent erred in determining that petitioner is not entitled to a stepped-up basis for property known as the Freeport property. He determined that the basis to petitioner was $744,797.23 for 1935, and $749,008.41 for 1936, representing the cost basis of such property to the original owner of the property, the Freeport Water Co. adjusted for subsequent additions and retirements. Respondent takes the view that petitioner s basis is the same as the basis in the hands of the transferor, Peoples Illinois, which, in turn took the basis of its transferor, Freeport Water Co., because each transfer of the Freeport property was made pursuant to a tax free reorganization.

Petitioner claims a stepped-up basis and a corresponding increase in the allowance for depreciation in the taxable years on the ground that the Freeport property was purchased in 1927 and acquired a new basis as a result. At the hearing, petitioner waived its contention that respondent erred in reducing the rate of depreciation from 2½ to 2 percent in both years   Petitioner claims that taxes for the years in question have been overpaid. Petitioner has filed claims for refund.

Petitioner filed its returns for the taxable years 1935 and 1936 with the collector for the second district of New York.

Some of the facts have been stipulated, and such stipulation of facts is adopted as part of the findings of fact and is incorporated by reference. Those facts appearing hereinafter which are not found in the stipulation are facts otherwise found from exhibits attached to the stipulation and from testimony introduced at the hearing.

The property involved, referred to as the Freeport property, was originally owned by the Freeport Water Co. In November of 1926 it was transferred to the Peoples Utilities Illinois Corporation, which in turn transferred the property to petitioner in September of 1927. Petitioner contends that in each transfer of the property the transfer was not within the nonrecognition provisions of the statute, so that the basis after each transfer in 1926 and 1927 was the amount paid for the property. Petitioner makes other contentions, in the alternative, in the event its primary contention is rejected.

It is necessary first to consider th  last transaction. Accordingly, the facts are set forth in inverse order, in point of time. The facts and opinion relating to the acquisition of the Freeport propery by petitioner from Peoples Utilities Illinois Corporation will be set forth first; and the facts and opinion relating to the acquisition of the same property by Peoples Utilities Illinois Corporation from the Freeport Water Co. will be set forth last.

## I. *Acquisition of Freeport Property by Petitioner.*

FACTS.—1. Petitioner, an Illinois corporation, has its principal office at Champaign, Illinois. It was organized on November 26, 1926. During the taxable years it engaged in the business of operating water service utilities in the cities of Freeport, Sterling, Streator, and Champaign-Urbana, in the State of Illinois, and it owned certain waterworks properties consisting of buildings, distributing systems, pumping stations, filter houses, reservoirs, wells, materials, tools, and plant equipment. Petitioner was a subsidiary of the Federal Water Service Corporation, a holding company, in 1935 and 1936.

2. The W. B. Foshay Co., a Minnesota corporation (sometime referred to as "Foshay" hereinafter), having its principal office in Minneapolis, was engaged in an investment and management business in 1926 and 1927. It specialized in the sale of new issues of securities and in the ownership of common stock of public utility companies. During 1926 the Foshay Co. organized and developed the Peoples Light & Power Corporation, hereinafter called Peoples, which was a holding company which owned the controlling voting stock of subsidiary corporations in several states, including Indiana, Illinois, Wisconsin, Virginia, California, Washington, Oregon, Minnesota, and Arizona. The subsidiary companies owned and operated properties. Peoples Utilities Illinois Corporation, hereinafter called "Peoples Illinois," and Peoples Utilities Indiana Corporation, hereinafter called "Peoples Indiana" were subsidiaries of Peoples which owned all of the outstanding common stock (voting stock) of these companies. At the end of 1926 Peoples together with its subsidiaries constituted a holding company system. The Foshay Co. managed the business and operations of Peoples under a broad management contract. The Foshay Co. had developed the Peoples system.

The plan of organization of the Peoples system was to organize new domestic corporations within the states where operating properties were acquired, and to vest the ownership of the operating properties in such domestic corporations, which in turn operated the properties and conducted a business of furnishing and selling public utility service to consumers. The securities of the domestic corporations were held entirely by Peoples, and Peoples in turn issued its own securities against the securities of the subsidiary companies. The assets of Peoples consisted solely of senior and junior securities of subsidiary corporations. Some of the securities of Peoples were sold to G. L. Ohrstrom & Co., a dealer in securities in New York City, sometimes referred to hereinafter as "the Ohrstrom Co." or as "Ohrstrom," for resale to the public, and some of the securities of Peoples which were received by the Foshay Co. in transactions with Peoples were sold to

the public through Foshay's own selling organization. The Ohrstrom Co. was not connected with the Foshay Co.

The Foshay Co. at the end of 1926 controlled Peoples through the ownership of substantially all of its class B common stock; it also owned some of Peoples' class A common stock, preferred stock, debenture notes, and the notes of some of the subsidiaries. During 1926 and 1927 Peoples' class B common stock was the sole voting stock of the corporation.

The Foshay Co. managed Peoples and its subsidiaries in the following way: It had a management contract with Peoples which placed the direct management of the business of Peoples under the executive department of Foshay; Foshay could nominate the officers and directors of Peoples; it provided Peoples with an accounting service, purchasing service, advertising service, new business service, power engineering, inspection service, a corporation record service, treasury department service, financial service, and engineering and construction service. It was paid for all of such services at agreed rates. Also, Foshay undertook the initial promotion of the acquisition of new utility properties by entering into contracts with owners to acquire the stock or the properties of outside utility companies with the intent of placing those properties in existing corporations which were subsidiares, or in new corporations which would be subsidiaries of Peoples.

As of January 31, 1927, the consolidated balance sheet of Peoples and its subsidiaries showed assets of a total value of a little over $32,000,000, the bulk of which consisted of property, plants, equipment, land, and water rights valued at $22,568,263.

3. The Foshay Co. and the Ohrstrom Co. were both concerned with the marketing of securities of the Peoples system. A disagreement arose between the two companies. In the early part of 1927 both companies recognized that their disagreements were serious. The Foshay Co. was willing to sell all of its control in Peoples to the Ohrstrom Co. Accordingly, the Foshay Co. and the Ohrstrom Co. executed a contract dated March 22, 1927, under which Foshay sold to Ohrstrom all of its interest in Peoples Light & Power Co., the holding company, for a stated money consideration. The agreement covered many details so that the Foshay Co. would step out of all relations with Peoples and its subsidiaries. Among other things, Foshay agreed to sell and Ohrstrom agreed to purchase 45,000 shares of Peoples' class B common stock (the total number of outstanding shares) and debenture notes of Peoples in the principal amount of $422,500 for $1,200,000; a maximum of 16,040 shares of Peoples' preferred stock, or a minimum of 15,840 shares, at $90 a share; a maximum of 8,860 shares of Peoples' class A common stock, or a minimum of 8,600 shares, at $24 per share. The maximum amount

to be paid by Ohrstrom for stock and debentures of Peoples was $2,856,240. Foshay agreed, also, to sell to Ohrstrom all of the outstanding capital stock of Green Mountain Power Co., an outside company, for $247,500.

There were certain pending contracts to which the Foshay Co. was a party, about 10 of them, under which Foshay was committed to purchase or had options to purchase the capital stock of outside utility companies in several states, or certain properties, or the physical properties of the outside companies. Petitioner refers to these properties as the "May 3rd properties." All of these contracts were between the Foshay Co., as vendee, and the respective vendors, and no mention is made in the contracts of Peoples or of any of its subsidiary corporations. It had been the intent of Foshay to put the new properties into existing subsidiaries of Peoples, or into newly organized subsidiaries, which would issue their securities to Peoples and Peoples would in turn issue new securities of its own against the securities of the subsidiary corporations. It was also intended that Foshay would acquire the new securities of Peoples and would market them through the Ohrstrom Co. On December 31, 1926, Foshay offered to sell said new securities of Peoples to Ohrstrom. The above plan of Foshay to market new securities of Peoples in order to finance Foshay's contracts relating to the purchase of the "May 3rd properties" was not carried out. Rather, under the March 22 agreement, Foshay assigned to Ohrstrom all of its interest in those contracts and Ohrstrom itself was to proceed to purchase properties under the contracts.

Under the above 10 contracts Foshay had options to purchase or was committed to purchase the following properties and securities: (a) All the physical properties of the Alturas Electric Power Co., an electric power company in California; (b) all the capital stock of the New Jersey Northern Gas Co., $75,000 par value, and not less than $243,000 principal amount of its bonds, or, all the physical property and assets of that company; (c) all the common capital stock of the Platteville Gas Co., a Wisconsin corporation, aggregating $40,-704.71 par value, and all of its preferred stock, aggregating $15,000 par value; (d) all the common capital stock of the Citizens Gas Co.; (e) all of the properties owned by Consolidated Electric Light Co. at John Day and Canyon City, Oregon, consisting of electric light and power plants and distributing systems; (f) properties of the Prairie Power Co., an Oregon corporation, located at various places in Oregon, consisting of an electric light and power plant, a hydroelectric power generating station, and certain water rights; (g) properties of the Lakeview Water Co., an Oregon corporation, consisting of a waterworks plant at Lakeview, Oregon; (h) certain properties in Oregon and California from N. P. Jensen, consisting of electric light and

power plant and hydroelectric steam power generating station; (i) various pieces of land, water rights, and flowage rights located in Vermont and known as the "Green River Power Development"; and (j) certain property in Vermont owned by the Clyde River Power Co., in receivership.

Foshay had paid about $567,443.83 under all these contracts in part payment of the respective consideration under each contract, and also had expended $57,449.03 out-of-pocket expenses in connection with the contracts and had incurred salary expenses of its own employees of at least $1,000. It was provided in the March 22 agreement with the Ohrstrom Co. that Foshay would assign to Ohrstrom both the contracts and the payments which had been made thereunder, and Ohrstrom agreed to reimburse Foshay for all of its cash advances, plus 6 percent interest, plus the above out-of-pocket expenses, salaries expense of $1,000, and reasonable costs of acquiring the contracts which Foshay had incurred but which had not yet been billed to Foshay or paid. Ohrstrom agreed to assume all obligations of Foshay under the contracts.

The Foshay Co. owned notes, made payable to its order, of subsidiary corporations of Peoples representing advances of money by Foshay to such subsidiaries. The total amount of the notes was $398,950.07. Foshay agreed to assign all of the notes to Ohrstrom, or its nominee, and Ohrstrom agreed to purchase the notes from Foshay for the principal amounts of the notes, plus accrued interest. None of these notes were notes of Peoples Illinois. They were notes of Peoples' subsidiaries in Arizona, Iowa, Minnesota, Wisconsin, and on the West Coast.

Under the contract with Foshay, Ohrstrom was to pay Foshay a total amount of about $4,128,583, for everything.

Foshay agreed to deliver to Peoples and its subsidiaries resignations of the officers and directors of the companies in the Peoples system and of other companies in which Ohrstrom acquired Foshay's interests, and to transfer the management of Peoples to Ohrstrom. Foshay and Ohrstrom were to give each other mutual releases.

Foshay and Ohrstrom executed the March 22 agreement on March 22, 1927.

On the same day as it executed the agreement, the Ohrstrom Co. assigned the March 22 agreement with the Foshay Co. to its subsidiary, the Federal Water Service Corporation, i. e., on March 22, 1927, pursuant to a separate agreement with Federal dated March 22, 1927. Ohrstrom assigned to Federal all its rights under the agreement with Foshay, and Federal assumed all of Ohrstrom's obligations and liabilities, except in one or two matters which are not material. Federal had been organized in 1926.

Under the terms of the March 22 agreement, the vendee made a down payment of $250,000 upon the execution of the agreement, and 45,000 shares of the class B stock of Peoples were deposited by Foshay in escrow as collateral to secure Foshay for the payment of further amounts until the total additional payments of $850,000 were made by the vendee, when the stock was to be released from escrow. However, by virtue of the down payment of $250,000, the vendee became the owner of the class B stock, subject to the escrow, with full power to vote the stock as stockholder. Accordingly, as assignee of the March 22 agreement, Federal acquired control of Peoples Light & Power Corporation and its subsidiaries through the ownership of all of the voting stock of that company on or about March 22, 1927.

The agreement of March 22, 1927, contained no provisions and made no reference whatsoever to the transfer of any physical properties owned by any subsidiary of Peoples to Ohrstrom or to any corporation controlled by Ohrstrom, or to any subsidiary of such corporation. It did not make any reference to the transfer by Ohrstrom, or any corporation it controlled, to Peoples or to any subsidiary of Peoples of any properties owned or to be acquired by Ohrstrom or any subsidiary of Ohrstrom. The March 22 agreement related to the sale by Foshay to Ohrstrom of the controlling interest in Peoples Light & Power Co., to the transfer of the management thereof to Ohrstrom, and to the assignment of several contracts to which Foshay was an original party.

On and after the execution of the above agreement and the assignment thereof to Federal, Federal had the right to do whatever it wished to do in connection with the management of Peoples and its subsidiaries, and Foshay had no interest or concern whatsoever in the future of Peoples and its subsidiaries. In short, under the terms of the March 22 agreement, Federal purchased the controlling stock of Peoples and thereafter it was in full control of the whole Peoples utility system. Whatever plans of its own Federal may have had with respect to what it would do with all or any part of the Peoples system, or with any particular properties held by Peoples or its subsidiaries, or with any new properties which Federal was to acquire from outside vendors or corporations after it had obtained control, was wholly within the discretion of Federal and was separate and apart from the terms of the March 22 agreement. The consideration which Federal paid to Foshay under the March 22 agreement was for nothing other than the particular stocks, securities, and interests which are described in detail in the agreement.

4. Christopher T. Chenery, a practicing engineer, became interested in 1926 in developing a holding company system for water service companies. Throughout the United States small water service companies were still privately owned, and he believed they could be pur-

chased and brought under a new holding company system. G. L. Ohrstrom, an investment banker and the owner of G. L. Ohrstrom & Co., was familiar with the financing of water companies. Chenery discussed his plan with Ohrstrom. Chenery and Ohrstrom organized the Federal Water Service Corporation, hereinafter called "Federal," on June 21, 1926, under the laws of the State of Delaware, and they intended it to be a parent company owning the stock of subsidiaries.

Originally all of the voting stock of Federal, class B common stock, was owned by G. L. Ohrstrom & Co. In the latter part of 1926 Chenery acquired stock in Federal, and after February 7, 1927, Federal's stock was owned by the Ohrstrom Co., 51,346 shares; Chenery, 13,650 shares; and directors, 4 shares; the total outstanding stock being 65,000 shares. Chenery owned 21 percent of the stock and the Ohrstrom Co. and directors owned 79 percent.

Federal was a holding company and a management company. It was never intended that it would be an operating company, but it was the plan that Federal would own the controlling stock of subsidiary corporations which would be operating companies. The general plan was to purchase privately owned water properties in each state and to bring such properties together into a single, newly organized corporation within the state. It was never intended that Federal would own any physical properties. Chenery and his associates preferred to arrange a purchase directly of the physical properties from individual or corporate vendors, but if such procedure was not possible, the controlling stock of an outside corporation was purchased first and later the physical properties were transferred to a Federal subsidiary corporation and the outside corporation was dissolved. Pursuant to this plan of procedure, during 1926 and 1927, Federal arranged for the purchase of the controlling stock or the property and assets of several independent water companies and water and electric light companies in Indiana, New Jersey, West Virginia, Michigan, New York, Pennsylvania, Ohio, and other states and put the various physical properties into new subsidiary corporations of its own in those states. In all instances Federal owned the common stock of its subsidiaries. The senior securities of the subsidiaries' preferred stock and bonds were sold. The senior securities of subsidiaries were sold to the Ohrstrom Co. by Federal or by the subsidiary company, itself, and Ohrstrom resold the securities to the public.

5. Shortly after its incorporation, Federal acquired for cash all the stock of Champaign and Urbana Water Co. (Champaign), and of Sterling Water Co. (Sterling). Also, Federal acquired 99.82 percent of the stock of Streator Aqueduct Co. (Streator). All of these companies owned water properties in Illinois. Pursuant to its plan, on February 2, 1927, Federal caused Champaign, Streator, and Sterling to transfer all their properties to petitioner, which had been organized

on November 26, 1926, in exchange for petitioner's stock and bonds, petitioner assuming the liabilities of the transferors. In the contracts covering the transfers of assets of the above companies to petitioner, it was agreed that after such transfer each company would cease to operate as a public utility company. The Illinois Commerce Commission ordered each of the three companies to cease operations as public utility concerns after transferring their properties to petitioner. Petitioner issued its stock as follows:

| | |
|---|---:|
| Champaign | 5, 907 shares |
| Streator | *5, 687 shares |
| Sterling | 2, 406 shares |
| | |
| Total | 14, 000 shares |

*Includes 6 shares of petitioner's stock issued to directors which were treated as belonging to Streator.

Champaign, Streator and Sterling immediately distributed part of petitioner's bonds and stock as a dividend to Federal, after which petitioner's stock was held as follows:

| | |
|---|---:|
| Federal | 2, 863 shares |
| Champaign | 3, 560 shares |
| Streator | 5, 556 shares |
| Streator minority stockholder | 1 share |
| Sterling | 2, 020 shares |
| | |
| Total | 14, 000 shares |

In addition to issuing its stock to the above companies in payment for their respective assets bonds of petitioner were to constitute part of the consideration in the total principal amount of $2,100,000, part of which were to be issued direct to each company, in specific amounts, and part of which were to be retained by petitioner to be used to pay assumed liabilities of the companies. Accordingly, petitioner issued to the three companies a total of $264,000 of its bonds and sold to the Ohrstrom Co. $1,436,000 of its bonds, using the proceeds to pay the indebtedness of the other companies. Petitioner was to retain the balance of $400,000 of bonds until its earnings equaled 1¼ times the interest requirements of all of the outstanding bonds, and petitioner retained such amount of bonds.

In July of 1927 Federal purchased from Streator's one minority stockholder the 1 share of petitioner's stock held by the estate of the individual.

On September 22, 1927, Sterling distributed to Federal all of the stock of petitioner which it held, 2,020 shares, as a dividend.

On December 31, 1927 Champaign, Sterling, and Streator were dissolved, and as of that date Federal received as a final liquidating dividend from Champaign and Streator all of the stock of petitioner owned by each, namely, 45,580 shares, being new common stock into

which petitioner converted 9,116 old common on September 23, 1927, as stated hereinafter.

6. At some time prior to June 2, 1927, Federal purchased the securities or properties covered by some of the Foshay contracts, which petitioner calls the "May 3rd properties," to wit, the securities or properties of Alturas, New Jersey Northern Gas, Platteville Gas, Citizens Gas, Consolidated Electric Light, Prairie Power, N. P. Jensen (referred to in paragraph 3, *supra*, items a to f, inclusive, and h). Federal expended about $1,084,838.67 under the above contracts to acquire the above securities and properties. Federal also expended $307,290.19 to purchase the notes of the subsidiaries of Peoples to Foshay, as was required by the March 22 agreement. The total sum thus expended was $1,392,128.86, exclusive of some additional expenses which were paid after June 30, 1927. Federal did not intend placing the physical assets of the above companies in any of its own subsidiaries because the properties were gas and electric properties. Federal intended putting these gas and electric properties into the Peoples system, which it controlled.

On June 2, 1927, Federal offered to sell to Peoples all of the securities which it had acquired in Citizens Gas, New Jersey Northern Gas, Platteville Gas, and Jersey Shore Gas and demand notes of certain subsidiaries of Peoples issued against the acquisition of the properties of Alturas, Prairie Power, Consolidated Electric Light, and N. P. Jensen, in the total principal amount of $403,900, and notes of other subsidiaries of Peoples payable to Foshay in the total principal amount of $299,303.10, in consideration of the delivery to Federal, or its nominee, of all of the outstanding common stock and first mortgage 5½ percent bonds of the Peoples Utilities Indiana and Peoples Utilities Illinois corporations. There were $205,000 bonds of Peoples Indiana and $650,000 bonds of Peoples Illinois. It was provided in the offer of June 2, 1927, also, as follows:

It is also understood and agreed that, pending delivery to us [Federal] of the securities above mentioned, we may proceed with proper corporate proceedings looking toward the sale of the assets of Peoples Utilities Indiana Corporation and Peoples Utilities Illinois Corporation to Indiana Water Service Company and Illinois Water Service Company, respectively, subsidiaries of this corporation, and that you will cooperate with us in such proceedings *provided, however, that no consummation of the sale of the assets of the foregoing companies shall be effective as long as the same shall be subsidiaries of your corporation* as defined in the First Lien Indenture with The Equitable Trust Company of New York dated July 1, 1926. [Italics added.]

Peoples accepted Federal's offer on June 2, 1927. On June 30, 1927, Federal acquired bonds and stocks of Peoples Illinois, pursuant to the terms of the June 2 agreement. Federal held the stock of Peoples Illinois until that corporation was dissolved on December 31, 1927

7. On May 23, 1927, petitioner entered into a contract with Peoples Illinois to "purchase" all of its properties, comprising the Freeport property. Under this contract Peoples Illinois was to transfer the Freeport property to petitioner in exchange for petitioner's stock and bonds. Under an amendment to the agreement dated July 29, 1927, it was agreed that petitioner was to give Peoples Illinois 3,500 shares of its common stock and $650,000 of its first mortgage 5 percent gold bonds in exchange for its assets. It was also provided that petitioner could withhold $400,000 of said bonds until such times as its earnings reached a stated level. It was provided in the agreement that the said stock and bonds of petitioner would be accepted by Peoples Illinois in full payment for all of its properties to be transferred to petitioner. The Illinois Commerce Commisssion approved the sale of the Freeport property by Peoples Illinois to petitioner on September 14, 1927, and on September 16, 1927, petitioner acquired all of the assets of Peoples Illinois, subject to certain liabilities. It was understood that Peoples Illinois would "cease operation as a public utility" upon completion of the transfer of its assets to petitioner. On September 22, 1927, petitioner issued to Peoples Illinois 3,500 shares of its common stock and its note dated September 15, 1927, for $650,000 payable in its first mortgage 5 percent gold bonds.

The order of the Commission approving the transaction stated that bonds bearing 5 percent interest and secured, such as the bonds petitioner proposed to issue, would have a sale value of approximately 88 percent of their face value, and, as the stock might be considered to be worth its par value, the aggregate value of the proposed issue of bonds and stock would be $922,000. The Commission refused to accept the appraisal of Stone & Webster of September 1, 1926, as "representing a proper and reasonable valuation for the property involved in this proceeding," but said such property might reasonably be considered as being worth the consideration given by petitioner, namely, 3,500 shares of its capital stock and $650,000 of its 5 percent gold bonds.

The order of the Commission recited its approval of the conveyance by Peoples Illinois "for the consideration of" the above stated shares of stock and bonds of petitioner, with the $400,000 withholding provision as aforesaid. The order also permitted petitioner to elect to assume existing funded indebtedness or other indebtedness constituting liens against the property to be transferred, but if petitioner did so elect, it was to reserve a sufficient number of the aforesaid bonds of its own for sale at not less than 88 to produce sufficient funds to retire such assumed indebtedness. The order required Peoples Illinois to cease operations as a public utility thereafter.

8. On September 22, 1927, the day of the receipt of petitioner's stock and note, Peoples Illinois transferred to Federal as a partial

liquidating dividend the 3,500 shares of petitioner's stock. Federal recorded on its books the receipt of this stock as part of a liquidating dividend from Peoples Illinois as follows: Debit, $446,672.25, "Investment in Illinois Water Service Co. Common stock, 3,500 shares." Credit, $446,672.25, "Investment in Peoples Utilities Ill. Corp. (Freeport)."

9. Federal held $650,000 of bonds of Peoples Illinois which it had acquired from Peoples. Peoples Illinois owned $650,000 of bonds of petitioner which it had received along with the 3,500 shares of petitioner's stock, evidenced by a note of petitioner for $650,000 payable in its bonds. On September 23, 1927, Peoples Illinois paid its bonded indebtedness in full by giving Federal the note of petitioner for $650,000, duly endorsed to Federal, and Federal returned to Peoples Illinois its own bonds. The journal voucher of Peoples Illinois recording the transfer of the note of petitioner to Federal shows a debit "Bonded Debt" in the amount of $650,000, against which is a credit for $650,000, "Note Receivable." The explanation of the entry is as follows:

To record the retirement of our Funded Debt—by giving to Federal Water Service Corp. the holder of our bonds—a note of the Illinois Water Service Corporation for the face amount of $650,000 payable in bonds of that company in exchange for our bonds.

Federal recorded on its books the receipt of the $650,000 note as follows: Debit, $581,750, "Notes Receivable from Affiliated Co's. (Ill. W. S. Co.)." Credit, $581,750, "Investment in Peoples Utilities Ill. Corp. $581,750." The explanation for the above entry is as follows:

To record receipt as a partial liquidating dividend [sic] from Peoples Utilities Illinois Corp. of a note of Ill. Water Service Co., for amount $650,000.00 payable in Bonds of Illinois Water Service Co. having a sale value of $89.50 per hundred dollars of bonds.

Federal received from petitioner a total number of its bonds in the face amount of $650,000 on various dates beginning September 23, 1927, when Federal received bonds in the amount of $250,000, and ending January 31, 1930, during which interval Federal received the remaining bonds in the amount of $400,000.

10. While the application of petitioner and Peoples Illinois for approval of the sale to petitioner of the latter's assets was pending before the Illinois Commerce Commission (said application having been filed jointly on May 24, 1927), petitioner, on July 28, 1927, increased its authorized capital from 16,000 shares of common stock of a par value of $100 each (of which 14,000 shares were outstanding) to 17,500 shares of common stock of the same par value. On September 7, 1927, petitioner amended its certificate of incorporation so as to authorize an increase in authorized capital stock from $1,750,000 consisting of 17,500 shares of common stock, to $2,000,000 consisting

of 20,000 shares of preferred stock, par value $100, and 50,000 shares of common stock, no par value. The new preferred stock and common stock had equal voting rights, share for share.

On September 15, 1927, the Illinois Commerce Commission granted an application of petitioner to convert 7,500 shares of its common stock into 7,500 shares of 6 percent cumulative preferred stock, and to convert 10,000 shares of common stock into 50,000 shares of no par value common stock.

11. After September 22, 1927, and before petitioner converted any of its stock into new preferred and new common, petitioner's stock was held as follows:

| | |
|---|---:|
| Federal | 8,384 shares |
| Champaign | 3,560 shares |
| Streator | 5,556 shares |
| Total authorized and outstanding shares | 17,500 shares |

12. On September 23, 1927, acting with reference to the authorization given by the Illinois Commerce Commission and the amendment to its articles of incorporation, petitioner proceeded to convert its old common stock, consisting of 17,500 shares held by Federal, Champaign, and Streator, into new preferred stock and new common stock. After that conversion, petitioner's new preferred and common stocks were held as follows:

| Company | New common | New preferred |
|---|---:|---:|
| | Shares | Shares |
| Federal | 4,420 | 7,500 |
| Champaign | 17,800 | |
| Streator | 27,780 | |
| Total | 50,000 | 7,500 |

13. Previously, on August 29, 1927, prior to petitioner's acquisition of the assets of Peoples Illinois but after Federal had acquired all of the common stock of Peoples Illinois from Peoples, and after petitioner had entered into a contract with Peoples Illinois to purchase all of the latter's assets in exchange for its own stock and bonds, Federal had entered into a contract with the Ohrstrom Co. to sell to Ohrstrom, if, as, and when issued, $250,000 of petitioner's 5 percent gold bonds at 89½, and 7,500 shares of petitioner's preferred stock at 88. In accordance with this agreement, Federal sold to Ohrstrom a total of 7,500 shares of petitioner's preferred stock at 88, on September 30, 1927, October 5, 1927, and November 1, 1927.

14. On December 1, 1937, petitioner sold the aforesaid Freeport water works property to the city of Freeport for $1,253,400 in cash.

15. On August 3, 1938, petitioner filed its corporation income and excess profits tax return for the calendar year 1937 in the office of the

collector of internal revenue for the second New York district. In that return petitioner reported a profit of $211,298.30 on said sale, using in its computation of profit a basis of $1,042,101.70, which is the highest basis now being contended for by petitioner herein, with certain adjustments, and not the old basis to Peoples Illinois and to Freeport.

16. For the fiscal year ended May 31, 1927, Federal filed with the collector of internal revenue for the second district of New York a consolidated income tax return for itself and affiliated subsidiaries which included as affiliated companies petitioner, Champaign, Streator, and Sterling. For the fiscal year ended May 31, 1928, Federal filed with said collector a consolidated income tax return which included as affiliated companies Champaign, Streator, Sterling, and Peoples Illinois (the last from July 1, 1927), but petitioner was omitted therefrom. Petitioner filed a separate income tax return with the collector of internal revenue for the second district of New York for the entire taxable period beginning June 1, 1927.

For the fiscal year ended July 31, 1927, Peoples Light & Power Corporation filed with said collector a consolidated return for itself and affiliated subsidiaries, including Peoples Illinois, to July 1, 1927.

17. The basis for the depreciation deduction on the Freeport properties used by petitioner in its income tax returns for the taxable years 1935 and 1936 and for prior years was the same basis used by Peoples Illinois, which was in turn the same basis used by Freeport Water Co., with appropriate adjustments for subsequent additions and retirements.

18. On March 3, 1938, petitioner filed claims for refund of income taxes paid for 1935 and 1936 on the ground that it had computed its depreciation on an improper basis.

19. After Champaign, Streator, and Sterling distributed all of their assets to petitioner on February 2, 1927, they were in fact nominee corporations of Federal. It was intended by Federal, the sole stockholder of these three corporations, that they would be dissolved after distributing to Federal their only remaining assets, consisting of stock and bonds of petitioner. The three corporations held some of petitioner's stock during 1927 until final distribution thereof was made to Federal on or about December 31, 1927, as mere nominees of Federal. After February 2, 1927, Federal owned all of the outstanding stock of petitioner, to wit, 14,000 shares of common stock of a par value of $100 a share, directly and through its nominees, Champaign, Streator, and Sterling.

20. The agreement of March 22, 1927, between the Foshay Co., the vendor, and the Ohrstrom Co., the vendee, was carried out by Federal, the assignee of Ohrstrom. Federal did not take the assignment of the March 22 agreement for the limited, planned purpose of acquiring the assets of Peoples Indiana and Peoples Illinois. Federal took the

assignment of that contract only for the purpose of carrying out the terms of the March 22 contract as they were written. After Federal acquired the class B stock of Peoples, the Peoples system was controlled by Federal in substantially the same way that Federal controlled its own holding company system. After March 22, 1927, Federal, in any negotiations and contracts with Peoples, was dealing with a controlled corporation. In reality, after March 22, 1927, the real parties with controlling interests behind both Peoples and its subsidiaries, and Federal and its subsidiaries, were the Ohrstrom Co. and Chenery, the sole stockholders of Federal.

21. The agreement of March 22, 1927, was a complete agreement and no provision contained therein obligated Federal to do anything covered by the separate agreement of June 2, 1927, between Federal and Peoples. The agreement of June 2, 1927, was a complete agreement and no provision contained therein had any connection with the March 22 agreement.

Under the March 22 agreement Federal became the assignee of Foshay of executory contracts with outside companies and individuals without any obligation to Foshay or to Peoples with respect to the subject matter of those contracts. Federal succeeded to Foshay as a party to those contracts but, thereafter, Federal was an independent party thereto. Federal did not acquire the so-called "May 3rd properties" (the properties or securities of Alturas, Platteville Gas, New Jersey Northern Gas, etc.) with any obligation to convey them to Peoples. No debtor-creditor relation between Federal and Peoples existed as a result of Federal's purchase of the so-called "May 3rd properties." When Federal purchased those properties, it did so for its own account and it became the sole owner thereof. When Federal sold some of those properties and securities to Peoples under the June 2 contract it did so independently of any of the terms of the March 22 agreement. Peoples purchased from Federal the properties and securities described in the June 2 contract independently of any provisions in the Foshay contract of March 22 to which Peoples was not a party. The consideration which Peoples paid to Federal under the June 2 contract consisted of the stock and bonds of Peoples Illinois and Peoples Indiana.

Federal did not intend to purchase or to acquire the assets of Peoples Illinois, to wit, the Freeport property, either directly, or indirectly through the purchase of the stock of Peoples Illinois. Federal did not purchase the assets of Peoples Illinois when it purchased the stock of Peoples Illinois under the June 2 contract. Federal did not at any time acquire the assets of Peoples Illinois directly or constructively. Federal did not purchase the Freeport property for the account of petitioner.

Federal intended to cause Peoples Illinois to transfer all its assets to petitioner at some time after Federal would acquire all the stock of Peoples Illinois. It was provided and agreed in the June 2 contract between Federal and Peoples that Peoples Illinois would not consummate a sale of its assets as long as it was a subsidiary of Peoples. Peoples Illinois ceased to be a subsidiary of Peoples on June 30, 1927.

22. Federal caused Peoples Illinois and petitioner to enter into the contract of May 23, 1927. On that date Federal controlled Peoples Illinois through its ownership of the voting stock of the then parent, Peoples; and Federal controlled petitioner through ownership of all of petitioner's outstanding stock by itself and through its nominees, Champaign, Streator, and Sterling. Peoples Illinois was a subsidiary of Federal on September 16, 1927, when it transferred its assets to petitioner. It was not a subsidiary of Peoples at that time and Peoples had nothing to do with the initiation or the consummation of the sale of the assets of Peoples Illinois to petitioner.

23. Peoples Illinois was the transferor of the Freeport property. Federal was not, directly or constructively, the transferor of the Freeport property. The contract of May 23, 1927, between Peoples Illinois and petitioner was a complete contract in itself and was not connected with the June 2 contract between Peoples and Federal.

Petitioner received the Freeport property from Peoples Illinois, and Peoples Illinois received from petitioner, in exchange, 3,500 shares of petitioner's stock and petitioner's note for $650,000, payable in its bonds. Under this separate transaction, petitioner received the Freeport property from Peoples Illinois pursuant to a reorganization.

Petitioner was not furnished any funds by Federal with which to purchase the Freeport property, and petitioner did not make a direct purchase of the Freeport property from Peoples Illinois for cash.

24. Federal received 3,500 shares of petitioner's stock from Peoples Illinois as a distribution in liquidation. Federal received the note of petitioner, payable in bonds, in the amount of $650,000, from Peoples Illinois as payment by that corporation of its indebtedness on its bonds which Federal owned. Federal did not receive 3,500 shares of stock and $650,000 of bonds of petitioner from petitioner in exchange for the Freeport property under a constructive transfer thereof to petitioner from Federal.

OPINION.—The Freeport property which petitioner acquired in 1927 from Peoples Illinois had been acquired by that corporation in November of 1926 from the Freeport Water Co. under circumstances which are set forth hereinafter under separate findings of fact. For purposes of computing depreciation allowances, Peoples Illinois had used as the basis of the Freeport property the cost to the Freeport

Water Co. After petitioner acquired the Freeport property, it, in turn, used the same basis which Peoples Illinois had used, so that in its income tax returns for 1935 and 1936 petitioner originally carried over the basis of its transferor, with appropriate adjustments for additions and retirements. Respondent accepted as correct the basis used by petitioner in its returns. It was not until after a petition was filed here that petitioner, through amending its petition, made claim for a stepped-up basis for the Freeport property. Respondent reduced the rate of depreciation which petitioner had employed from 2½ to 2 percent, which reduced the amount of the depreciation deduction claimed in each year, which gave rise to the deficiencies. If both of the issues presented are decided against petitioner, the deficiencies will be sustained. If one of the issues is decided in petitioner's favor there will be no deficiencies, but under a Rule 50 recomputation it will appear that petitioner overpaid tax in each taxable year.

Petitioner now contends that it did not acquire the Freeport property in 1927 pursuant to a reorganization so that the basis of the transferor corporation became petitioner's basis. Petitioner contends that the Freeport property was purchased and, therefore, acquired a new basis in a larger amount than the basis of Peoples Illinois. Such is petitioner's main contention, and its alternative contentions need not be set forth at this point.

The broad question is whether petitioner acquired the Freeport property pursuant 'to a reorganization, and in the broadest reaches of the question all of the following provisions of the revenue acts are pertinent: Sections 114 (a), 113 (b), and 113 (a) (12) of the Revenue Acts of 1934 and 1936; section 113 (a) (7) of the Revenue Act of 1932; section 112 (i) (1) and (j) of the Revenue Act of 1932; sections 203 (b) (3) and (4). 203 (h) (1) and (2), and 203 (i) of the Revenue Act of 1926. See *Muskegon Motor Specialties Co.*, 45 B. T. A. 551, 557. 558; affd., 134 Fed. (2d) 904; certiorari denied, 320 U. S. 741. The transfer of the Freeport property took place in 1927. The Revenue Act of 1926 was then in effect. The provisions of sections 203 (h) (1) and (2) and 203 (i) of the Revenue Act of 1926 are the same as the provisions of section 112 (i) (1) and (2) and 112 (j) of the Revenue Act of 1932. Whether we should go to the Revenue Act of 1926 or to the Revenue Act of 1932 for the purpose of determining whether or not there was a reorganization as defined in section 113 (a) (7) of the Revenue Act of 1932, the result necessary would not be different; for the 1932 version of the definition of reorganization is identical with the comparable provisions of the 1926 Act. See *Muskegon Motor Specialties Co.*, *supra*; cf. *Schweitzer & Conrad, Inc.*, 41 B. T. A. 533, 539, 540; *Palm Springs Holding Corporation* v. *Commissioner*, 315 U. S. 185.

Petitioner acquired all the assets of Peoples Illinois on September 16, 1927, and gave in exchange 3,500 shares of its common stock (then the only authorized stock) and $650,000 in its bonds. This transfer was a reorganization within the definition of section 112 (i) (1) (A) of the Revenue Act of 1932,[1] which includes a merger or consolidation within the definition of a reorganization, *Nelson Co.* v. *Helvering*, 296 U. S. 374; *Helvering* v. *Watts*, 296 U. S. 387, unless other factors were present to prevent the transaction from coming within the statutory definition under unwritten requirements of the statute such as a lack of business purpose, of continuity of interest, and of permanence. See Law of Federal Income Taxation, Mertens, vol. 3, p. 183, par. 20.49; *Le Tulle* v. *Scofield*, 308 U. S. 415; *Nelson Co.* v. *Helvering*, *supra*. The above section of the statute is not to be read literally. The acquisition of the assets of one corporation by another does not in every instance constitute a reorganization within the statutory definition. Respondent takes the view that the parenthetical clause in section 112 (i) (1) (A) covers the transaction under which petitioner acquired the Freeport property.

It is necessary to set forth the arguments of petitioner which call for special construction of three contracts which are fully described in the findings of fact and are called hereinafter the contracts of March 22, June 2, and May 23. All were executed in 1927. With respect to the March 22 contract, petitioner alleges that Federal took assignment thereof from Ohrstrom as a step in a plan to purchase the physical properties, which were waterworks properties, of Peoples Indiana and Peoples Illinois, so that such objective was paramount. Petitioner then contends that Federal took the role of a nominee of some type in purchasing various properties and securities of outside, independent concerns, the so-called May 3 properties, for the purpose of putting them into the Peoples holding company system, and that after making such purchases (under contracts to which Federal had become a party under assignments from Foshay for good consideration) Federal had a "claim for reimbursement" for its expenditures, plus interest, which "was assumed" by Peoples, so that "the arrangement under which Federal acquired the miscellaneous properties" gave rise to a debtor-creditor relationship under which Peoples was al-

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

    \*        \*        \*        \*        \*        \*        \*

(i) DEFINITION OF REORGANIZATION.—As used in this section and sections 113 and 115—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are tranferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

[The above definition is the same as in section 203 (h) (1) of the Revenue Act of 1926.]

legedly obligated to pay Federal $1,392,128.86. From this petitioner argues that Peoples paid the above obligation by causing its subsidiaries, Peoples Indiana and Peoples Illinois, to transfer their physical assets to *Federal*, constructively, and the fact that the June 2 contract provided only that the stock and bonds of those corporations were to go to Federal (in exchange for the May 3 properties) was a mere matter of form, and the transaction under the June 2 contract, between Peoples and Federal, "should be treated as a purchase of assets by Federal for the amount of money owing to it on account of the Ohrstrom-Foshay contract of March 22, 1927." In support of this theory petitioner relies on *Prairie Oil & Gas Co.* v. *Motter*, 66 Fed. (2d) 309, and *Ashland Oil & Refining Co.* v. *Commissioner*, 99 Fed. (2d) 588; certiorari denied, 306 U. S. 661. In developing the theory, petitioner construes the three contracts as constituting steps in a unitary transaction beginning on March 22, 1927, and ending in September of 1927, and invokes the doctrine that a series of related transactions must be treated as a whole for tax purposes, citing *Howard* v. *Commissioner*, 56 Fed. (2d) 781; certiorari denied, 287 U. S. 619; *Commissioner* v. *Schumacher Wall Board Corporation*, 93 Fed. (2d) 79, and other cases.

Under the above theory of the transaction in which Federal acquired the miscellaneous properties and agreed to transfer them to Peoples, petitioner arrives at its claimed basis for the Freeport property. Petitioner contends that its expenditures of $1,392,128.86 for the miscellaneous properties must represent the value of those properties and must represent the amount which *Federal* paid for the water properties of Peoples Indiana and Peoples Illinois, so that such amount is the value in 1927 of the two groups of water properties. Petitioner allocates eleven-fifteenths of said amount to the Freeport property and one-fifteenth to the property of Peoples Indiana, and after various adjustments arrives at the amount of $934,129.78. That amount is the claimed basis of the Freeport property to petitioner. It is unnecessary to set forth the reasons for the above percentages and the arithmetical computations used by petitioner in computing the amount of the stepped-up basis it now claims.

So far, petitioner has offered the theory that *Federal* purchased the Freeport property. The next part of petitioner's theory develops an explanation of petitioner's acquisition of the property, as follows: Petitioner is said to have constructively received the Freeport property from *Federal* in exchange for petitioner's stock and bonds; and, as Federal controlled petitioner after the transfer of the Freeport property by ownership of more than 80 percent of petitioner's voting stock, no gain or loss would be recognized "on this constructive transfer of the Freeport properties from Federal to petitioner under Section 203 (b) (4) of the Revenue Act of 1926 and petitioner would take Federal's cost as its basis under Section 113 (a) (8) of the Revenue

Acts of 1934 and 1936." Petitioner suggests a comparison between the situation, as it construes it, and the situation in *Davis* v. *United States*. 88 Ct. Cls. 579; 26 Fed. Supp. 1077; certiorari denied, 308 U. S. 574. In any event, petitioner says, "Whether the transaction be treated as a purchase of properties by Federal and a subsequent transfer thereof to petitioner or as a purchase by Federal for the account of petitioner, the cost of the Freeport properties to petitioner is the cost thereof to Federal or the amount of Federal's claim which was paid by transfer of said properties."

Petitioner's argument is imposing; it is complex. The parties were able to agree upon a statement of some of the facts, but a great quantity of the evidence consists of many documents which were attached to the stipulation of facts as exhibits and which comprise several volumes. The facts have been carefully brought together and considered. The three contracts of March 22, June 2, and May 23, and the general circumstances have been given particular consideration. Many recent cases have been considered which were not cited by petitioner, to determine their applicability, if any, to this issue in this case; for example, see *Helvering* v. *Bashford*, 302 U. S. 454; *Groman* v. *Commissioner*, 302 U. S. 82; *Anheuser-Busch, Inc.* v. *Helvering*, 115 Fed. (2d) 662; certiorari denied, 312 U. S. 699. But the facts, in our opinion, do not support the theories of petitioner and we must reject them.

The March 22 contract is perfectly clear, and none of its provisions lend themselves to the theory of petitioner. Executed by the Ohrstrom Co., that contract was immediately assigned to Federal and it is *not* a reasonable inference that such assignment was made for the narrow and limited purpose of enabling Federal and one of its subsidiary corporations, petitioner, merely to acquire the water properties of Peoples Indiana and Peoples Illinois. The March 22 contract was primarily a contract for the sale of the controlling stock of Peoples, and other provisions in the contract were plainly for the purpose of achieving a complete divorce of the Foshay Co. from the Peoples holding company system, the achievement of which necessitated assigning Foshay's uncompleted contracts with outside concerns. The economic benefits to Federal of all of the rights which it acquired under the March 22 contract were obviously great and far reaching. Once Federal acquired control of Peoples it was in a position, of course, to work out particular rearrangements of holdings of particular properties, but it can not be said that there was anything in the March 22 contract which obligated Federal to do any of the particular things which later were done under the June 2 and May 23 contracts. It is not necessary to elaborate upon this observation. Accordingly, we reject petitioner's theory that some unitary transaction relating to the Freeport property had its origin in the March 22 contract; that Federal carried out its

purchases of miscellaneous properties under contracts assigned to it by Foshay with some unwritten understanding that it would be reimbursed and that Peoples assumed Federal's claim for reimbursement. All of such contentions of petitioner represent a picture which is not supported by the terms of the March 22 agreement or by a preponderance of the evidence. That agreement, by its terms, was an independent agreement between Foshay and Federal, the assignee of Ohrstrom, and it must be construed with reference to its clear terms. In fact, after the Foshay contracts were assigned to Federal for valuable consideration as set forth in the March 22 agreement, Federal's execution of those contracts with Alturas, Platteville, and other concerns and individuals was, in each instance, a distinct transaction of purchase. The so-called May 3 properties were acquired under distinct contracts which had no connection with the March 22 contract or the June 2 contract. Federal could do as it pleased with those miscellaneous properties and securities. Its decision to sell them to Peoples was the natural disposition of them, but that does not detract from the fact that Federal *sold* them to Peoples under the June 2 contract. Respondent's contentions lead us to believe that that transaction had a tax consequence separate from the subsequent transfer of the Freeport property to petitioner.

The next consideration must be directed to the June 2 contract. Again its terms are the sole guide to the construction of that contract. The consideration received by Federal was only the stock and bonds cf Peoples Indiana and Peoples Illinois for Federal's sale of the properties described in the contract. That transaction was not comparable to the transactions in the *Prairie Oil & Gas Co.* and the *Ashland Oil & Refining Co.* cases, *supra*, where the intention of the vendees of stock of certain corporations was to acquire the physical properties of those corporations. Here, Federal was not an operating company; it had no intention of acquiring the property of Peoples Illinois; it did not acquire the stock of People Illinois as a step in taking over its property. The above cases are distinguishable upon their respective facts.

But the most important circumstance of the June 2 contract is that certainly Federal caused Peoples, a corporation under its control, to enter into the June 2 contract and caused that contract to be written with particular terms which fixed as separate steps any subsequent transfers by Peoples Illinois and Peoples Indiana of their assets to subsidiaries of Federal. It was provided that "no consummation of the sale of the assets of the foregoing companies shall be effective as long as the same shall be subsidiaries of your corporation [Peoples] * * *." It was expressly provided, in effect, that Peoples was not to be the promoter of any sale by Peoples Illinois of its properties to another corporation.

We are told by respondent that petitioner has at all times treated the transfer of the Freeport property as a tax free transaction up to the present time.[2] Petitioner does not deny that the transaction originally escaped tax. There is no evidence before us upon the point. but the record indicates that petitioner was allowed by the respondent to treat the transfer of the Freeport property as coming within the nonrecognition of gain or loss provisions of the statute. Federal required the clause in the June 2 contract presumably for the purpose of putting Peoples Illinois in the position of transferring its assets to petitioner pursuant to a tax-free reorganization within the statutory definition. Thus. Federal apparently had the deliberate purpose of separating the transaction between Peoples Illinois and petitioner from its own transaction (involving the miscellaneous new properties) with Peoples, and that purpose appears to have had specific tax purposes, the Federal-Peoples transaction of June 2 resulting in a tax. as far as we know, and the Peoples Illinois-petitioner transaction resulting in no tax, as far as we know. In this situation we take the view that neither Federal nor its subsidiary. petitioner, may now complain because respondent has determined that the two transactions were separate, as they were intended to be. rather than mere steps in a single unitary plan, as petitioner belatedly urges. See *Lyon, Inc.* v. *Commissioner*, 127 Fed. (2d) 210. See also *Durand-McNeil-Horner Co.* 30 B. T. A. 769, 773; affd., 84 Fed. (2d) 18 (sub nom. *Fairbanks Court Wholesale Grocery Co.*) ; certiorari denied. 299 U. S. 582.

It is essential under the definition of a reorganization that the transferor of property, or its stockholders. continue to have a substantial interest in the property in the hands of the transferee. Our conclusions are premised upon the following views: (1) There was no interdependence in the three contracts of March 22, June 2, and May 23, and the transactions under the contracts were not. mere steps in a

[2] Respondent makes the following statement and argument in his brief :

"*  *  *  In the view of the parties involved. as shown by the amounts of stock and bonds issued against it, by the appraisals and the contentions made in the applications to the Illinois Commerce Commission, the Freeport property had undoubtedly appreciated in value when the transfers here involved took place. If its later sale to the city of Freeport for the sum of $1,253,400.00 in cash in 1937 (Stipulation, paragraph 67) be given any weight, the property continued thereafter to increase in value. Yet no tax on that appreciation in value has ever been paid, under petitioner's prior adoption of the view in which we concurred and to which we still adhere that the transfers were tax free. To permit petitioner to step up its basis at this time, in the shadow of a profitable sale of the Freeport property, would be to enable petitioner to escape tax upon a very substantial, if not the major portion of, a gain which it has unquestionably realized. It was to prevent such an escape that the provisions compelling a transferee to use the transferor's basis, where the enterprise continued simply in a modified corporation form, were adopted. Where, as here, the petitioner merely carries on as an operating utility company the enterprise of furnishing water which had been formerly carried on by a different corporation, namely, Peoples Illinois. and where both corporations were. at the time of the transfer of the utility property. owned by the same parent, namely, Federal, the situation immediately calls for the application of the provisions preventing the use of a stepped-up basis. The situation is even stronger than that because of Federal's prior control of Peoples Light and Power

unitary plan. The findings of fact so indicate in finding that each contract was independent and not intertwined or essential to the others. (2) Peoples Illinois and petitioner were parties to a reorganization within the meaning of section 203 (b) (3) of the Revenue Act of 1926. Peoples Illinois exchanged its property for stock and bonds of petitioner (3) Immediately after Peoples Illinois transferred its assets to petitioner, its stockholder, Federal, had a substantial interest in petitioner, and we think it was in control of petitioner, the corporaion to which the assets were transferred. Sec. 203 (h) (1) (A) and (B) Revenue Act of 1926. and sec. 112 (i) (1) (A) and (B). Revenue Act of 1932. On June 30. 1927. Federal owned all of the stock of Peoples Illinois. On September 16, 1927, Peoples Illinois transferred its assets to petitioner in exchange for stock and bonds of petitioner. On September 22 Peoples Illinois transferred the stock of petitioner to Federal. On September 22 Federal owned all of the then outstanding stock of petitioner itself and through its nominees. Champaign and Streator. On September 22. out of 17,500 shares of petitioner's stock, Federal owned directly 8.384 shares and through its two ncminees 9,116 shares. We hold that Federal, the sole stockholder of Peoples Illinois, was in "control" of petitioner immediately after the Freeport property was transferred to petitioner under either section 203 (i) of the Revenue Act of 1926 or section 112 (a) (7) of the Revenue Act of 1932. Cf. *United Light & Power Co.* v. *Commissioner,* 105 Fed. (2d) 866; certiorari denied, 308 U. S. 574. However. if there be any doubt on the point of Federal's "control" of petitioner immediately after the exchange, we think there is no doubt that Federal had a definite and substantial interest in petitioner so that petitioner's acquisition of all of the assets of Peoples Illinois amounted to a reorganization under sectin 203 (h) (1) (A). *Nelson Co.* v. *Helvering, supra.* (4) We reject petitioner's view that the transfer by Peoples Illinois was a step in a sale by Peoples of its interest in the assets of Peoples Illinois. The transaction between petitioner and Peoples Illinois did not begin at any time when Peoples had any interest in the transferor or its assets. It began, rather, after Peoples had disposed of all of its interest and when Federal was the sole stockholder of the transferor, Peoples Illinois. Accordingly, we reject the view that the transaction, as it involved Peoples Illinois, petitioner, and Federal, lacked the required continuity of interest in the Freeport property because Peoples acquired no interest in petitioner.

It is held that petitioner acquired the Freeport property pursuant to a reorganization within the definition in section 112 (i) (1) (A), and the basis to petitioner is the same as the basis was in the hands

of Peoples Illinois. *Commissioner* v. *Schumacher Wall Board Corporation, supra,* does not apply. Respondent's contentions are sustained.

## II. *Acquisition of Freeport Property by Peoples Illinois.*

Petitioner's alternative contention is that if petitioner should be required to use the basis of its transferor, Peoples Illinois, that basis was not the basis of the Freeport property to the Freeport Water Co., but was the cost thereof to the Foshay Co. We make the following findings of fact under this second issue:

FACTS.—25. Consumers Public Service Corporation, hereinafter called Consumers, a Delaware corporation, was a holding company in 1926. It owned all of the common stock of Wood River Power Co., an Idaho corporation; and all except 50 shares of the common stock of Freeport Water Co., an Illinois corporation. The Wood River Co. owned all of the stock of Hailey Water Co., an Idaho corporation. The outstanding stock and bonds of all of these companies on or about August 1 1926, were as follows:

| Corporation | Common stock | Preferred stock | Bonds |
|---|---|---|---|
| | *Shares* | | |
| Consumers | 4,000 | | $400,000 |
| Wood River | 2,000 | | 210,000 |
| Hailey | 175 | $43,400 | 17,500 |
| Freeport | 2,500 | | 388,400 |

[It is stipulated that there were outstanding 5,000 shares of the Freeport stock, but this is in conflict with the statements and balance sheet in Exhibit B that the total authorized issued stock was 2,500 shares.

On August 1, 1926, all of the authorized and outstanding common stock of Consumers was owned by three individuals, Edwin J. Smail, Claude F. Baker, and William J. Walsh.

The Wood River Co. owned electric plants and distributing systems at Hailey, Ketchum. Cascade, and other towns in Idaho. The Hailey Water Co. owned the water plant and system at Hailey, Idaho. The Freeport Water Co. owned the water plant and system at Freeport, Illinois. As of December 31, 1925, the balance sheets of the above companies showed total assets and liabilities as follows:

Wood River _____ $468,285.74
Hailey _____ 87,432.44
Freeport _____ 830,042.20

The consolidated balance sheet of Consumers and subsidiaries as of December 31, 1925, showed total assets and liabilities of $1,342,685.28.

26. The W. B. Foshay Co. (see paragraph 2 of findings of fact—I) had organized Peoples Light & Power Corporation in March of 1926 and Foshay owned the controlling stock of Peoples, with a few minor

exceptions, such stock being the class B common stock which had the sole voting rights.

27. On August 16, 1926, an agreement was executed between Smail, Baker, and Walsh, as vendors, and the W. B. Foshay Co., as vendee. The agreement provided, *inter alia*, for the sale of 4,000 shares of the capital stock of Consumers, which was all of its stock, for $400,000, payable $200,000 in cash at the time of the closing of the contract and $50,000 per month thereafter until the balance was paid; i. e., the vendee was to deliver $200,000 par value 7 percent cumulative preferred stock of Peoples Light & Power Corporation at the closing and was to repurchase said stock at par at the rate of $50,000 per month. The date for the closing of the contract was set forth in the contract to be November 15, 1926. The contract was closed on that date in New York City. The agreement provided that the parties were not to receive any interest in the cash or property which each was to give to the other. respectively. until the closing of the contract.

The vendee, Foshay. agreed either to redeem or make provision for the redemption of all the outstanding bonds of Consumers in the principal amount of $400,000 prior to or contemporaneously with the closing of the contract, and the obligation of the vendors to close the transaction was conditioned upon the vendee's compliance with such agreement.

The purchase price of all of the stock of Consumers was based on the balance sheets of Consumers, Wood River, and Freeport as of December 31, 1925, and upon the balance sheet of Hailey as of May 31, 1926, and also upon the income account of Consumers for a 12-month period ended June 30. 1926. The purchase price was subject to adjustments by way of appreciation or depreciation of *net assets*, as determined by audit as of November 15. 1926. the closing date.

The vendors agreed to deposit with a named depository within 15 days from August 16. 1926, 4,000 shares of stock of Consumers. At the time of the closing. the vendors agreed to deliver to Foshay endorsed certificates of stock of Wood River, Freeport, and Hailey as follows: 2,000 shares of Wood River, 2,500 shares of Freeport, and 175 shares of Hailey. The vendors agreed that at the consummation of the purchase said shares of stock would be free and clear of all liens and claims.

The agreement of August 16, 1926, provided that all of the physical properties of Wood River. Freeport, and Hailey were to be sold to Foshay, or its nominee, and the following was agreed.

13. It is agreed that the stockholders, directors, and officers of the aforesaid corporations, prior to the closing date, will authorize the sale of the physical properties to the vendee, or its nominee, and will execute all such deeds, conveyances, assignments, bonds, notes and trust deeds as may be required, all these, however, to be placed in escrow with CONTINENTAL AND COMMERCIAL TRUST & SAVINGS BANK OF THE EQUITABLE TRUST COMPANY, as heretofore stated.

It was further provided that the vendors would promptly, after August 16, 1926, deliver to the vendee full and complete abstracts of title to all real estate, certified copies of all franchises, licenses, and easements, and all other papers necessary to enable the vendee to examine and pass upon titles of all real estate and other property. As Consumers owned no operating properties, such provisions related to the properties owned by the subsidiaries of Consumers. The vendee agreed to examine all papers within 30 days after deposit thereof and to deliver to the vendors a written memorandum objecting to defects of every kind, and if such defects were not cured within 30 days after notice the entire agreement of August 16 was to become void.

The vendees were to be permitted to examine the plants, property, business, and books of the corporations, and the vendors agreed to furnish all information. The vendors agreed to keep the plants and properties in good condition until the consummation of the purchase. The vendors agreed to furnish the vendee and cause to be executed all deeds, bills of sale, etc., necessary to carry out the agreement.

28. Under the August 16 agreement Foshay intended acquiring the physical assets of Wood River, Freeport, and Hailey for its nominees. Foshay intended that the properties should be conveyed to new or existing corporations which were or would become subsidiaries of Peoples Light & Power Co. It was intended that the transfers of the properties would be made contemporaneously with the closing of the August 16 agreement and that thereafter Consumers, Freeport, Wood River, and Hailey would be dissolved.

On September 20, 1926, Foshay and Peoples entered into a contract under which Foshay agreed to purchase various securities of Peoples, and in payment therefor Forshay agreed to deliver to Peoples the capital stock and first mortgage bonds of the corporations to which Foshay would cause to be transferred various plants and properties, including the properties of Freeport, Wood River, and Hailey. This agreement was amended on October 4 and November 1 only with respect to the amounts of the securities of Peoples which Foshay agreed to purchase. Under the agreement as amended Foshay agreed to purchase the following securities of Peoples: (a) $2,100,000 of First Lien 5½ percent bonds; (b) $1,000,000 5½ percent gold notes; (c) $957,000 one year 5½ percent debenture notes; (d) $300,000 7 percent cumulative preferred stock; (e) 9,000 shares of class A common stock. Foshay was to give Peoples $2,100,000 first mortgage bonds of new or existing corporations; Foshay was to deliver the bonds and stocks of corporations to Peoples on or before November 15, 1926.

29. On October 18, 1926, Peoples Utilities Illinois Corporation was incorporated under the laws of Illinois, with its principal office in Freeport. Its total authorized stock was 6,500 shares, no par value.

W. B Foshay was president of Peoples Illinois. He was also president of the W. B. Foshay Co.

30. On October 18. 1926, the Foshay Co. made an offer to Peoples Illinois which was accepted the same day. Foshay offered to subscribe for 6.340 shares of the no par value capital stock of Peoples Illinois and to purchase $650,000 principal amount of its proposed first mortgage 5½ percent gold bonds, in payment for which Foshay agreed to cause to be delivered to Peoples Illinois. free and clear of all encumbrances. the water plant and distributing system "now belonging to Freeport Water Company." Peoples Illinois was to file an application with the Illinois Commerce Commission requesting the Commission to authorize the transfer of the Freeport properties.

It was understood. in the above offer, that if the offer was accepted the Freeport property was to be received by Peoples Illinois as the "full purchase price for said bonds and stock."

On October 18, 1926 the Foshay Co. made an offer to Freeport Water Co. which recited that Foshay had previously entered into a contract with Smail, Baker, and Walsh to acquire all of the capital stock of Consumers. and that upon the consummation of that contract Foshay would be the absolute owner of all of Freeport's capital stock, and that Foshay desired that all of Freeport's property should be transferred to Foshay or its nominee, after which steps would be taken to dissolve Freeport and Consumers. In contemplation of such results, Foshay submitted a proposal to Freeport, as follows: Freeport was to transfer to Peoples Illinois its water plant and distributing system and franchises and was to transfer to Foshay all other property. consisting of cash, notes, and accounts receivable, materials, and supplies. Foshay agreed to pay all of the bonded indebtedness of Freeport and all of its obligations and liabilities and to deliver to Freeport all of its capital stock for cancellation. It was agreed that Freeport would file an application with the Illinois Commerce Commission requesting the Commission to authorize the transfer of its properties. It was also agreed that, upon the transfer of the Freeport property to Peoples Illinois, proceedings for the dissolution of Freeport would be instituted.

Freeport accepted Foshay's offer on October 18. 1926.

Also, on October 18. Foshay proposed to Consumers that it cause Freeport, Wood River, and Hailey to accept Foshay's offers to purchase their properties in consideration of Foshay's payment of their debts, and that Consumers cause the necessary corporate action to be taken in each instance to effect the conveyances of the properties of the above corporations to Foshay or its nominees. Foshay agreed to pay the bonded indebtedness of Consumers in consideration for Consumer's compliance with Foshay's above requests. Consumers agreed to Foshay's proposal. Among other things, Foshay's offer to Consumers

stated that it was Foshay's desire that upon the consummation of the August 16 agreement all of the properties, franchises, and assets of Wood River. Freeport, and Hailey be transferred to Foshay or its nominees and that all necessary steps be taken to dissolve Consumers and each of the above companies, and that, looking to the accomplishment of that result, Foshay was making offers to purchase all of the properties of the above companies.

31. On October 23, 1926. Freeport and Peoples Illinois made a joint application to the Illinois Commerce Commission for an order authorizing the transfer of the water plant and distributing system from Freeport to Peoples Illinois. The application made reference to the respective agreements of Freeport and Peoples Illinois with Foshay dated October 18. Peoples Illinois applied for the Commission's authorization for its issuance of its bonds in the amount of $650,000 and 6,340 shares of its capital stock without par value, and Peoples Illinois declared that said bonds and stock were to be issued solely for the acquisition of the Freeport water property. The Commission was requested to consent to the dissolution of Freeport.

32. On November 9. 1926, the Illinois Commerce Commission gave its approval of the above application, authorizing the sale and purchase of the Freeport water property, free of all liens. for the consideration of $650,000 bonds and 6,340 shares of stock of Peoples Illinois. The order of the Commission stated that Peoples Illinois was authorized to issue its bonds and stock upon the condition that Peoples Illinois "shall deliver to the Freeport Water Company all of the bonds and all of the certificates representing the stock herein authorized to be issued, in full consideration of the purchase price of the water utility plant or property and assets of said The Freeport Water Company * * *, and that none of said bonds or said stock shall be used or applied for any other purpose whatsoever." The order also directed that Freeport should cease to operate as a public utility after the transfer of its assets. The order provided that the approval of the purchase and sale should not be construed as a finding of the value of the property in any rate proceeding or any other proceeding before the Commission, even though the matters submitted in the application indicated that "the value of the property * * * is at least equal to the value of the said bonds and stock," in the absence of evidence of the probable market value of the bonds and stock, but "in the light of common knowledge of security values."

33. As of November 1, 1926, all of the assets and liabilities appearing on the books of Consumers were credited and debited respectively and the net book value thereof in the amount of $565,049.66 was charged to an open account with Foshay. There were included among the assets of Consumers 2,450 shares of the stock of Freeport.

34. On November 15, 1926, Foshay deposited with trustees the funds necessary to accomplish the redemption of all of the securities of consumers and its subsidiaries outstanding in the hands of the public.

35. The closing of the August 16 agreement took place on November 15, 1926, in New York City and the agreement was carried out according to its terms. At the closing the following were done: Foshay paid in cash to Smail, Baker, and Walsh $195,000, the balance due on the agreed cash consideration of $200,000, and delivered $200,000 par value preferred stock of Peoples Light & Power Company; Foshay provided the funds for the redemption of the outstanding bonds and other securities of Consumers, Wood River, Freeport, and Hailey; Freeport conveyed its water plant and distributing system to Peoples Illinois, as Foshay's nominee, and its other assets consisting of cash, notes, etc., to Foshay; Peoples Illinois issued $650,000 bonds and 6.340 shares of stock which Foshay transferred, along with other property and securities, to Peoples; Peoples issued its securities to Foshay. In short, on November 15, 1926, all of the various contracts heretofore described were carried out according to their terms. Subsequently, Foshay paid in cash, at the rate of $50,000 a month, the balance of $200,000 and recovered the $200,000 par value preferred stock of Peoples Light & Power Co. Also, later, Consumers and its subsidiaries, including Freeport, were dissolved.

36. All of the transactions which Foshay entered into on August 16, 1926, were interrelated and interdependent, and were steps in a single plan, and were undertaken to accomplish the purposes of the August 16 agreement, which included the transfers of all of the properties of Wood River, Freeport, and Hailey to Foshay and/or its nominees. Smail, Baker, and Walsh received $400,000 in cash for both their stock in Consumers and their interests in the assets of Consumers' subsidiaries. They did not receive any stock or any interest in Peoples Light & Power Corporation. The preferred stock of Peoples which was delivered at the closing was merely collateral to secure the payment in cash by Foshay of the unpaid balance of the purchase price in the amount of $200,000. Also, Smail, Baker, and Walsh did not receive any interest in Peoples Illinois or in any of the other corporations to which were transferred the assets of Consumers' subsidiaries.

37. In addition to the consideration of $400,000 given by Foshay under the terms of the August 16 agreement, Foshay made additional expenditures in connection with the redemption of the securities of Consumers and its subsidiaries, and expenditures for miscellaneous matters, all of which were made in connection with the contract of August 16, 1926, as follows:

| Expenditures | Tota | Wood River & Hailey | Freeport | To be allocated |
|---|---|---|---|---|
| Repayment of advances made by vendors between date of Contract 8/16/26 and 11/15/26 | $21, 610. 32 | ------------- | ------------- | $21, 610. 3 |
| Appreciation of Assets 1/1/26 to 7/31/26 | 11, 950. 71 | ------------- | ------------- | 11, 950. 7 |
| Final payment on contract (including appreciation to 11/15/26) | 6, 227. 17 | ------------- | ------------- | 6, 227. 17 |
| Engineering and appraisal expense | 5, 418. 08 | ------------- | ------------- | 5, 418. 08 |
| Redemption of bonds: | | | | |
| *Deposited Refunded* | | | | |
| Consumers $434, 841. 25 $733. 93 | 434, 107. 32 | ------------- | ------------- | 434, 107. 32 |
| Wood River 228, 111. 00 2, 063. 89 | 226, 047. 11 | $226, 047. 11 | ------------- | ------------- |
| Hailey 18, 375. 00 --------- | 18, 375. 00 | 18, 375. 00 | ------------- | ------------- |
| Freeport 418, 819. 10 4, 291. 04 | 414, 528. 06 | ------------- | $414, 528. 06 | ------------- |
| Redemption of pfd. stock of Wood River | | | | |
| Deposited $44, 159. 50 | | | | |
| Less: Refunded 152. 59 | 44, 006. 91 | 44, 006. 91 | ------------- | ------------- |
| Purchase of 50 shares Freeport com stock | 7, 649. 52 | ------------- | 7, 649. 52 | ------------- |
| Trustee expense—Freeport bond redemption | 25. 00 | ------------- | 25. 00 | ------------- |
| Report on bond interest | 25. 00 | ------------- | ------------- | 25. 00 |
| Legal services | 8, 135. 78 | 3, 551. 00 | 4, 362. 17 | 222. 61 |
| Telephone | 2. 47 | ------------- | ------------- | 2. 47 |
| Certificate of dissolution | 3. 00 | ------------- | ------------- | 3. 00 |
| Traveling expenses | 918. 82 | ------------- | ------------- | 918. 82 |
| Incorporation fees | 569. 77 | ------------- | ------------- | 569. 77 |
| Franchise tax | 125. 00 | ------------- | 125. 00 | ------------- |
| 2% normal tax—Wood River & Hailey | 85. 05 | 85. 05 | ------------- | ------------- |
| 2% normal tax—Freeport | 52. 05 | ------------- | 52. 05 | ------------- |
| Excess of current liabilities over current assets—Hailey & Wood River | 245. 70 | 245. 70 | ------------- | ------------- |
| | 1, 200, 107. 84 | 292, 310. 77 | 426, 741. 80 | 481, 055. 27 |
| ***Credits*** | | | | |
| Cash balance—Consumers | 8, 507. 63 | ------------- | ------------- | 8, 507. 63 |
| Net current assets—Hailey & WoodRiver | 15, 731. 69 | 15, 731. 69 | ------------- | ------------- |
| Cash balance—Freeport | 28, 551. 77 | ------------- | 28, 551. 77 | ------------- |
| Net current assets—Freeport | 14, 880. 83 | ------------- | 14, 880. 83 | ------------- |
| Refund of Federal Tax—Freeport | 65. 50 | ------------- | 65. 50 | ------------- |
| Refund of Federal Tax—Consumers | 747. 21 | ------------- | ------------- | 747. 21 |
| Refund of 2% normal tax—Consumers | 42. 75 | ------------- | ------------- | 42. 75 |
| Interest | 31. 36 | ------------- | ------------- | 31. 36 |
| Total credits | *68, 558. 74 | 15, 731. 69 | 43, 498. 10 | 9, 328. 95 |
| Net cost of interest in underlying properties exclusive of current position | 1, 131, 549. 10 | 276, 579. 08 | 383, 243. 70 | 471, 726. 32 |

*The credits represent cash and other current assets which were taken over and retained by Foshay upon the liquidation of Hailey, Wood River and Freeport

The following are the balance sheets of Freeport, Wood River, and Hailey, as of November 1, 1926:

| | Freeport | Wood River | Hailey |
|---|---|---|---|
| ASSETS | | | |
| Cash | $27, 759. 59 | ------------- | ------------- |
| Notes receivable | 140. 00 | ------------- | ------------- |
| Accounts receivable | 24, 484. 02 | ------------- | $3, 062. 44 |
| Notes receivable—Consumers P. S. Co | 25, 000. 00 | ------------- | ------------- |
| Accounts receivable—Consumers P S. Co | 9, 100. 00 | ------------- | ------------- |
| Accounts receivable—Peoples West Coast Hydro Electric Co | ------------- | $11, 657. 09 | 10, 061. 93 |
| Accounts receivable—Hailey Water Co | ------------- | 6, 116. 66 | ------------- |
| Property accoun | 777, 241. 59 | 471, 187. 45 | 78, 123. 16 |
| Materials and supplies | 6, 074. 54 | ------------- | 3, 069. 12 |
| Work in progress | 7, 693. 34 | 517. 20 | 4, 887. 81 |
| Treasury securities (own bonds) | 3, 100. 00 | ------------- | ------------- |
| Investment in Hailey Water Co | ------------- | 6, 250. 00 | ------------- |
| Unamortized bond discount | 19, 185. 54 | ------------- | ------------- |
| Miscellaneous deferred charges | 355. 19 | ------------- | ------------- |
| Miscellaneous unadjusted debits | ------------- | ------------- | 185. 85 |
| Total | 900, 133. 81 | 495, 728. 40 | 99, 390. 31 |

| | Freeport | Wood River | Hailey |
|---|---|---|---|
| **LIABILITIE:** | | | |
| Cash (overdraft) | | | $124. 54 |
| Accounts payable | $2, 605. 87 | | 409. 70 |
| Notes payable | | | 11, 611. 35 |
| Accounts payable—Consumers P. S. Co | | $39, 497. 25 | |
| Accounts payable—Wood River Power Co | | | 6, 219. 48 |
| Dividends payable | | 253. 16 | |
| Accrued interest | 6, 473. 32 | 2, 100. 00 | 241. 85 |
| Accrued taxes | 7, 620. 71 | | 955. 33 |
| Unearned income | 467. 64 | | |
| Consumer's deposits | 563. 47 | | |
| Contributions for extensions | | 3, 197. 59 | |
| Reserve for depreciation | 70, 884. 36 | 47, 512. 13 | 43, 677. 31 |
| Reserve for contingencies | 3, 500. 00 | | |
| Reserve for bad debts | 860. 23 | | |
| Reserve for sinking funds | 118, 333. 33 | | |
| Miscellaneous reserves | | 2, 213. 13 | |
| Funded debt | 391, 500. 00 | 210, 000. 00 | 17, 500. 00 |
| Common stock | 250, 000. 00 | 170, 000. 00 | 5, 070. 00 |
| Preferred stock | | 43, 400. 00 | |
| Surplus (or deficit) | 47, 324. 88 | (22, 444. 86) | 13, 580. 75 |
| Total | 900, 133. 81 | 495, 728. 40 | 99, 390. 31 |

38. According to the balance sheets of Freeport and Wood River as of December 31, 1925, and of Hailey as of May 31, 1926, the value of the assets of each company, excluding working capital, to wit, capital stock, surplus, sinking fund reserve, the book value of Wood River's investment in Hailey, and the minority stock interest in Freeport, was as follows:

| | Value | Percent |
|---|---|---|
| Freeport | $407, 345. 05 | 71. 80 |
| Wood River | 141, 305 14 | 24. 91 |
| Hailey | 18, 650. 75 | 3. 29 |
| Total | 567, 300. 94 | 100. 00 |

39. The total amount paid by Foshay for the stock of Freeport on November 16, 1926. was $1,009,143.20. That amount was the fair market value on November 16 of the properties of Freeport. The Public Works Engineering Corporation appraisal of the Freeport property as of April 1, 1928. shows that the depreciable property constituted 89.71 percent of all assets of Freeport other than working capital. A reasonable allocation of the fair market value of the Freeport property on November 16, 1926, on the basis of this appraisal would attribute 89.71 percent of the total value to the depreciable properties, subject to adjustments for additions and retirements between November 16, 1926, and April 1, 1928.

OPINION.—Petitioner's contentions under this second issue, which are alternative contentions, follow the same pattern as its contentions under the first issue, but the facts under this issue are wholly different. Petitioner contends that Foshay purchased the assets of Freeport Water Co. (and of the other subsidiaries of Consumers) for cash in a

single transaction beginning with the contract of August 16, 1926, between Foshay and Smail, Baker, and Walsh (hereinafter referred to as S, B, and W), and terminating on November 15. 1926. when that contract was closed. Petitioner argues that the other contracts which Foshay executed on October 18, 1926. with Consumers. Freeport, and Peoples Illinois, and the contract which Foshay executed on September 20 with Peoples were all interdependent and were steps in an integral plan. So viewed, petitioner contends that Peoples Illinois did not acquire the Freeport property pursuant to a plan of reorganization.

Petitioner contends, further, that the basis of the Freeport property to Peoples Illinois, and hence to petitioner, in view of our conclusions under issue 1. was the amount expended by Foshay in connection with the purchase of the Freeport property, to wit, $905.302.36, subject to appropriate adjustments for additions and retirements. Consideration of petitioner's claims relating to the amount of the basis of the Freeport property will be considered last.

Respondent contends that Peoples Illinois acquired the Freeport property pursuant to a plan of reorganization, section 203 (h) (1) of the Revenue Act of 1926.

The facts need not be repeated. Under this second issue the facts support petitioner's broad contention. We can not find in the facts a plan of reorganization to which Freeport Water Co. and Peoples Illinois were parties within section 203 (b) (3) of the 1926 Revenue Act; we are unable to find the required continuity of interest in the same persons which is essential to a reorganization under (1) (A) of section 203 (h); and we are unable to find the "control" by the transferor corporation or its stockholders in the transferee corporation which is required under (1) (B) of section 203 (h). Accordingly, we must reject respondent's arguments under this issue.

It is well recognized that, where a series of related steps are all part of a plan, the various steps of the plan are to be regarded as making up one transaction for the purpose of determining the tax consequences. It is, therefore, the situation at the beginning and end of the transaction to which we must look to determine whether there has been a reorganization within the meaning of the statute, or merely a sale or taxable exchange. *Republic Steel Corporation* v. *United States*. 94 Ct. Cls. 476; *United Light & Power Co.* v. *Commissioner*, *supra; Prairie Oil & Gas Co.* v. *Motter, supra; Diescher* v. *Commissioner*, 110 Fed. (2d) 90; certiorari denied, 310 U. S. 650; *Howard* v. *Commissioner, supra.*

The contract of August 16 with S, B, and W, the stockholders of Consumers, for the purchase of their stock in Consumers was entered into by Foshay as a means and for the purpose of acquiring the physi-

cal assets of Consumers' subsidiaries. Such purpose is evidenced by clause 13 of that contract which provided that prior to the closing date, November 15, 1926, the vendors would have Consumers and its subsidiaries take all corporate action and execute and deposit in escrow all documents necessary to convey their assets to Foshay, or to Foshay's nominee. The whole transaction, ending on November 15, 1926, including Foshay's contracts of October 18 with Consumers, Freeport, and the newly organized corporation, Peoples Illinois. were means adopted to transfer the entire interest in the Freeport property from S. B, and W and Consumers, the equitable owners, to the nominee of Foshay (as well as the entire interest in the assets of Wood River and Hailey). The underlying plan was not for a continuance of ownership in the physical assets by the same persons in a different form, but was to effect a change in ownership. Cf. *Republic Steel Corporation* v. *United States, supra.* At the beginning of the transaction the Freeport property was owned by Freeport, whose stock was owned by Consumers, whose stock was owned by S, B, and W. At the end of the transaction the Freeport property was owned by Peoples Illinois, whose stock was owned by Peoples. None of the interest at the beginning carried through to the end of the transaction. The entire transaction was essentially in intent, purpose, and result a purchase of the Freeport property by Foshay itself or by Foshay for a nominee. Peoples Illinois received the Freeport property in exchange for its securities which were issued directly to Foshay, which then transferred them to Peoples in payment for securities issued by Peoples to Foshay.

Under the August 16 contract Foshay agreed to provide for the redemption of the outstanding bonds of Consumers. In the October 18 contract with Consumers, Foshay advised Consumers that it was offering to provide for the payment of all of the indebtedness of Consumers' subsidiary corporations, and Foshay again agreed to pay the bonded indebtedness of Consumers. All these agreements supplemented the underlying agreement of August 16 and must be regarded as relating to the underlying agreement. Also, under the October 18 agreements among Foshay and Freeport, Wood River, and Hailey, those companies agreed to sell their entire assets to Foshay and/or its nominee. The consideration all moved from Foshay and consisted entirely of cash. Until the November 15 closing, all that Foshay had was an option to purchase the stock of Consumers, and Foshay could not acquire the stock of the subsidiary corporations until it carried out its obligations to Consumers. Consumers was not to deliver the stock of the subsidiaries to Foshay until the closing on November 15. The plan as formulated and carried out was in every respect a plan for the sale of the physical assets of the subsidiaries, and all of the sales were

to be carried out, and were carried out simultaneously, on November 15, 1926. At the closing S, B, and W received cash for their stock; Foshay provided funds for the redemption of all of the outstanding securities of Consumers and its subsidiaries; Consumers delivered all of its assets to Foshay, consisting of the stock of the three subsidiaries, cash of $9,328.95, and other current assets; Foshay received cash and the current assets of Freeport, and its nominee, Peoples Illinois, received the operating water service properties. (We are not concerned under the issue with the disposition of the assets of Wood River and Hailey, but it appears that their assets were distributed in a similar manner.)

Under the facts Foshay, in buying the stock and paying the debts of Consumers and Freeport, in substance purchased all of the assets of Freeport, for cash. Thereafter S, B, and W, Consumers, and Freeport had no interest whatsoever in the assets of Freeport. We can not think of a clearer example of the purchase for money of the assets of a company by another company. Such purchase for cash is outside the purposes of the reorganization provisions of the statute. *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462; *Prairie Oil & Gas Co.* v. *Motter, supra; Cortland Specialty Co.* v. *Commissioner*, 60 Fed (2d) 937; certiorari denied, 288 U. S. 599; *LeTulle* v. *Scofield, supra.*

The August 16 contract and the contracts dated October 18 are so interlocked and interdependent that a separation of them is impossible. That factor, plus the contemporaneous acts at the November 15 closing, compels our viewing the transactions as steps in a unitary plan, and as fixing the beginning of the transaction at August 16, 1926. Under such view the consideration for the Freeport property was cash, and the persons who owned equitable interests in the Freeport property at the beginning were S, B, and W and/or Consumers. Since neither S, B, and W nor Consumers received any interest in Peoples Illinois, there is not the required continuity of interest in the same persons. Respondent's view implies a break in the transaction at some point so that the transfers of Freeport's assets partly to Foshay and partly to Peoples Illinois were pursuant to a transaction entirely separate from Foshay's transactions with S, B, and W and Consumers and were at a time when Foshay owned all of Freeport's stock. Such "break" would necessarily be at some moment during the closing on November 15. Foshay did not own, and could not have owned, the stock of Freeport at any time prior to November 15 under the express terms of the agreement of August 16. Everything done by Freeport was done with the cooperation of Consumers, which owned the Freeport stock, and during the time that Consumers owned that stock. Respondent's argument is necessitated by respondent's need for finding a "continuity of interest" in the transferred properties, which can only be found by

adopting the premise that Foshay was the sole stockholder of Freeport when Freeport transferred its property to Peoples Illinois. We must reject such premise.

Even if we could find a break in the transaction to enable our adopting such premise, we would then face another obstacle to the continuity of interest theory in Foshay's sale of the stock and bonds of Peoples Illinois to Peoples. Thus, Foshay's interest in and control of Peoples Illinois was too transitory to support the conclusion that in Foshay there resided the required continuity of interest. In the end Foshay received the stock of Peoples, whose wholly owned subsidiary, Peoples Illinois. held the property transferred by Freeport. Under those facts, there was no reorganization. See *United Light & Power Co.* v. *Commissioner, supra; Groman* v. *Commissioner, supra; Helvering* v. *Bashford, supra.* It does not help respondent to argue that Freeport was wholly owned by Foshay when it transferred the Freeport property to Peoples Illinois.

It is impossible to find that Foshay was a party to a reorganization of Freeport. See *Anheuser-Busch, Inc.*, 40 B. T. A. 1100; affd., 115 Fed. (2d) 662; certiorari denied. 312 U. S. 699. It does not aid respondent to find that the entire transaction between Foshay and S. B, and W and Consumers contained "a plan of reorganization" within the meaning of section 203 (h) (1) (A) of the Revenue Act of 1926. See *Anheuser-Busch, Inc., supra.* We do not agree that it did. There was no agreement between Freeport and Peoples Illinois; Freeport did not receive the securities of Peoples Illinois.

It is held that Peoples Illinois did not receive the Freeport property pursuant to a tax free reorganization within section 203 (h) (1).

Since the transaction does not qualify as a reorganization. the basis of the property is not established by section 113 (a) (7) of the Revenue Act of 1932, i. e., the basis to Peoples Illinois is not the same as the basis to Freeport.

We come, then, to the matter of the basis of the property to Peoples Illinois.

Petitioner contends that the basis of the Freeport property to Peoples Illinois is Foshay's cost in acquiring the Freeport stock less an amount of the total cost which is allocable to the nondepreciable property. Petitioner asserts that Foshay expended $1,009,143.20 for the Freeport stock. that 89.71 percent of the Freeport property is the depreciable property, so that the cost of the depreciable property is $905.302.36. The second question under the second issue relates to the determination. of the basis of the Freeport property to Peoples Illinois.

Petitioner has three alternative theories: (1) Foshay, in buying the stock and paying the debts of Consumers and Freeport, in substance purchased the Freeport properties (*Prairie* and *Ashland* cases) and

then transferred them to Peoples Illinois in a tax-free exchange under section 203 (b) (4) of the Revenue Act of 1926; or (2) Foshay, after acquiring the stock of Freeport, transferred the assets of that company to itself in a taxable liquidation and then transferred the properties to Peoples Illinois in a tax-free exchange; or (3) Foshay, in substance, purchased the Freeport properties for the account of Peoples Illinois, citing *Tulsa Tribune Co.* v. *Commissioner*, 58 Fed. (2d) 937. Under (1) and (2), above, the basis to Foshay would carry over to Peoples Illinois as a result of the tax-free nature of the transfer under section 203 (b) (4) of the 1926 Act.[8] Petitioner points out under (2) above that under 201 (c) of the 1926 Act the liquidation of the Freeport properties to Foshay would not have been tax-free, and, as a result, the basis of the Freeport properties to Foshay would have been their value on the date of the liquidation, which, petitioner contends, would be what Foshay paid for them in arm's length transactions with outside interests on the same day. Under all of the three theories the basis of the properties to Peoples Illinois would be $905,302.36, the cost of the Freeport stock to Foshay.

We must reject all of the petitioner's theories. We do not think the facts support the theory of petitioner under (3), above. The facts are dissimilar to the facts in the *Tulsa Tribune* case; Foshay did not provide Peoples Illinois, constructively or directly, with cash to purchase the Freeport property. With respect to the theories under (1) and (2), we can not agree that Peoples Illinois received the properties pursuant to a tax-free exchange under section 203 (b) (4), because the required control of Peoples Illinois by Foshay immediately after the transfer was lacking, as has been stated before. Foshay's ownership of the stock of People's Illinois was transitory and momentary because it immediately transferred the securities of Peoples Illinois to Peoples.

The facts are that Foshay subscribed for securities of Peoples Illinois and paid for them in the property of Freeport which was transferred direct to Peoples Illinois, apparently to save a needless, formal transfer to Foshay. But the exchange of the securities of Peoples Illinois for property was not a tax-free exchange. The cost to Peoples Illinois of the Freeport property was the fair market value of its stock and bonds. There is no evidence of the fair market value of the stock and bonds. At the time Peoples Illinois was a newly organized corporation and it had no other property. Under these circumstances, we think the rule may be applied that where there is

---

[8] (b) (4) No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

no other method of measuring the fair market value of stock and securities issued in exchange for properties, the fair market value on the date of exchange may be determined to be the equivalent of the fair market value of the property received. *Ida I. McKinney*, 32 B. T. A. 450; affd., 87 Fed. (2d) 811; *Rollestone Corporation*, 38 B. T. A. 1093, 1107. We take the view, accordingly, that the basis to Peoples Illinois of the Freeport property is the fair market value on November 15, 1926, of the securities of Peoples Illinois, and that such value is the fair market value of the properties received.

Under this theory, we reach the same result, however, which petitioner reached under each of its three theories, because the best evidence before us of the fair market value of the Freeport property is the amount which Foshay paid to acquire the Freeport stock in an arm's length transaction with outsiders. on the same day that the property was transferred to Peoples Illinois. We have concluded before that Foshay, in buying the stock and paying the debts of Consumers and Freeport. in substance, purchased the Freeport property. See *Warner Co.*, 26 B. T. A. 1225. and the *Prairie* case. It is held, therefore, that the fair market value of the Freeport properties on November 15, 1926, was $1,009,143.20, and this has been found as a fact. In the October 18 contract between Foshay and Peoples Illinois it was provided that "the purchase price to be paid in property as aforesaid is of a value not less than the value of the aforesaid bonds and stock." We are aware that Peoples took up the stock and bonds of Peoples Illinois received from Foshay on its books at $762,200, but there is no explanation before us for that fact. In view of the other evidence we do not regard the book value given by Peoples to said securities as determinative.

The sum $1,009,143.20 is the total of $383,243.70, net, which Foshay expended to purchase 50 shares of the Freeport stock from a minority stockholder and to pay the bonded indebtedness of Freeport, as is shown in the table in the finding of fact, and $625,899.50. the amount of the total expended to acquire the stock of Consumers ($881,055.27), which petitioner allocates to the stock of Federal on the basis of 71.80 percent of $881,055.27. We agree that this computation of petitioner is substantially correct. The explanation is as follows: Foshay paid $881,055.27 to acquire the stock of Consumers, which includes the amount provided to pay the bonded indebtedness of Consumers. The purchase price for the stock of Consumers itself was, under the August 16 contract, based upon the balance sheets of Consumers and the three subsidiaries. According to the balance sheets the book value of the Freeport assets represented 71.80 percent of the total values of the assets of Freeport. Wood River, and Hailey. The cost of the Freeport stock, itself, is determinable by reference to the purchase price

of the Consumers stock, and we think it is reasonable to allocate 71.80 percent thereof to the cost of the Freeport stock.

Petitioner asserts, next, that 89.71 percent of $1,009,143.20, or $905,-302.36, subject to appropriate adjustments for additions and retirements, constitutes the cost of the depreciable portion of the Freeport assets which passed to Peoples Illinois. Petitioner contends that a fair basis for allocating between the depreciable and nondepreciable property is found in the appraisal of the Public Works Engineering Corporation dated as of April 1, 1928. The respondent objects to the use of this appraisal as the basis for such allocation on the ground that it was not made contemporaneously with the acquisition of the property by Peoples Illinois, and that the standards of the appraiser can not be ascertained. We have carefully examined the appraisal in question, together with other evidence before us. We think the appraisal forms a substantially accurate basis for the allocation. It should, however, be adjusted as nearly as possible to the date of transfer by taking into consideration the retirements and additions during the period between the date of the transfer of the Freeport property to Peoples Illinois, November 15, 1926, and the time of the appraisal. We do not undertake to make such adjustments, but leave that to be done by the parties, and such adjustments, we believe, will reduce the percentage of 89.71 percent which petitioner has used. We approve, in substance, petitioner's method of allocating the cost of the Freeport property in the amount of $1,009,143.20 to the depreciable and nondepreciable properties.

The conclusions reached under issue 2 necessitate a recomputation of the allowances for depreciation in the taxable years which shall be done under Rule 50. Petitioner claims that taxes have been overpaid in both years.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

HILL and DISNEY, *JJ.*, concur only in the result.

---

MURDOCK, *J.*, concurring: I concur in the result reached on the second issue. The general rule of the statute is that the basis for gain or loss and for depreciation shall be the cost of the property to the owner. I do not find that the circumstances of the acquisition of the Freeport assets by Peoples Illinois bring this case within any of the exceptions. Therefore, I agree with the result reached in this case. Perhaps the closest question presented is whether or not this transaction might not have come under section 204 (a) (7). Starting with Foshay owning all of the stock of Freeport, we find that Freeport transferred its operating assets to Peoples Illinois; Foshay received a few assets of small

value and assumed the liabilities of Freeport; Foshay surrendered the Freeport stock to Freeport and Freeport was dissolved; and Peoples Illinois issued its stock and securities to Foshay but Foshay immediately passed them on to Peoples. Here there was a reorganization, since Peoples Illinois acquired substantially all of the properties of Freeport. But immediately after the transfer, an interest or control in the property did not remain in the same persons or any of them. Foshay was the sole stockholder of Freeport at the beginning, but immediately after the transaction was complete it held no stock of Peoples Illinois. I disagree with and deem unnecessary that part of the opinion based upon the holding that the purchase of the Consumers stock was an inseparable step in the plan of reorganization of Freeport. I see two different transactions—one, the purchase by Foshay of the Consumers stock and, two, all of the subsequent things which were done by Foshay to suit its own convenience.

MELLOTT and KERN, *JJ.*, agree with the above.