Peoples Water and Gas Company v. Commissioner.
Peoples Water & Gas Co. v. Commissioner
Docket No. 11837.
United States Tax Court
1948 Tax Ct. Memo LEXIS 176; 7 T.C.M. (CCH) 337; T.C.M. (RIA) 48105; June 1, 1948
*176 Petitioner, a subsidiary of a holding company, acquired certain properties in 1927 from the holding company, which had acquired the same properties from X and Y corporations by a purchase of all of the capital stock of these corporations. The petitioner had been organized by the holding company to own and operate these properties. Held, that the several transactions, beginning with the purchase of the stock of X and Y for cash and including the conveyance of the properties to petitioner as the operating subsidiary, were one transaction for tax purposes and the transfer did not come within any of the provisions of section 203 (h) (1) of the Revenue Act of 1926, or within section 113 (a) (7) of the Revenue Act of 1932. Francis L. Casey, Esq., 14 Wall St., New York, N.Y., for the petitioner. Clay C. Holmes, Esq., for the *177 respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined a deficiency of $12,576.25 in income tax of the petitioner for the taxable year ending December 31, 1939. The deficiency primarily results from the disallowance of a deduction for depreciation in the amount of $2,985.04 on the water works properties of the Mount Vernon plant acquired by petitioner from the Home Water & Ice Company, in 1927, and the water works property of the Burlington and Sedro-Woolley plants acquired from the Skagit Improvement Company, in 1927; and also from the disallowance of a loss of $58,609.08 on the sale of the water works properties of the Mount Vernon, Burlington, and Sedro-Woolley plants as of November 1, 1939. The question for decision is whether the cost basis for the purpose of computing depreciation and the determination of gain or loss upon the sale of these water works properties owned by petitioner is the amount paid for the stock of the predecessor corporate owners by Federal Water Service Corporation, who thereupon conveyed their properties to petitioner, or whether the cost basis of such properties is the cost to the predecessor *178 corporate owners. Findings of Fact The case was submitted upon a stipulation of facts. The stipulation is incorporated herein by reference and adopted as our findings of fact. Christopher T. Chenery, an engineer and G. L. Ohrstrom & Co. (hereinafter referred to as Ohrstrom), organized the Federal Water Service Corporation (hereinafter referred to as Federal), on June 21, 1926, under the laws of the State of Delaware. Federal was organized as a holding company for the purpose of acquiring small water service companies. After February 7, 1927, Federal's stock was owned as follows: Ohrstrom, 51,346 shares; Chenery, 13,650 shares; and directors 4 shares; the total outstanding being 65,000 shares. Chenery owned 21 per cent of the stock and the Ohrstrom Co. and directors owned 79 per cent. Federal was a holding company and a management company. It was not an operating company, but owned the controlling stock of subsidiary corporations which were operating companies. It purchased privately owned water properties in various states and brought such properties together into a single, newly organized corporation within each state. It was not intended that Federal would own and operate *179 physical properties. Chenery and his associates arranged a purchase directly of the physical properties from individual or corporate vendors, but if such procedure was not possible, the controlling stock of an outside corporation was purchased first and later the physical properties were transferred to a Federal subsidiary corporation and the outside corporation was dissolved. During 1926 and 1927, Federal arranged for the purchase of the controlling stock or the property and assets of several independent water companies and water and electric light companies in Indiana, New Jersey, West Virginia, Michigan, New York, Pennsylvania, Ohio, and other states and put the various physical properties into new subsidiary corporations of its own in those states. In all instances Federal owned the common stock of its subsidiaries. The senior securities of the subsidiaries' preferred stock and bonds were sold. The senior securities of subsidiaries were sold to the Ohrstrom Co. by Federal or by the subsidiary company, itself, and Ohrstrom resold the securities to the public. On or about April 15, 1927, Federal entered into contracts to purchase for cash from Portland Electric Power Company the *180 water properties and franchises at Hillsboro, Oregon, and Vancouver, Washington, from Salem Water, Light and Power Company, the water properties and franchises at Salem, Oregon, and all of the outstanding shares of stock of three Washington corporations, Hoquiam Water Company (hereinafter called Hoquiam), the Skagit Improvement Company (hereinafter called Skagit), which owned and operated the water plants at Sedro-Woolley and Burlington, Washington; and Home Water & Ice Company (hereinafter called Home), which owned and operated the water plant in Mount Vernon, Washington. The contract dated April 15, 1927, between Federal and Mount Vernon Investment Company, and others, the stockholders of Home, provided that Federal was to purchase all of the outstanding shares of Home for $150,000, in cash. A contract dated April 16, 1927, between Federal and W. R. Morgan, who owned or controlled all of the outstanding capital stock of Skagit, provided that Federal was to purchase all of the outstanding shares of Skagit for $184,000, in cash. The two above contracts were similar. Each provided for the sale of all of the outstanding stock of the companies. Each provided that the purchase price *181 was based upon the statement of physical assets, and that all of the properties at the time of the closing were to be vested in the respective companies free and clear of any encumbrances whatsoever; that the sellers would pay off all liabilities and indebtedness of the company and indemnify the buyers against any liabilities; that the sale of the stock was subject to the approval of the buyer as to the validity of all franchises and the validity and merchantability of all land titles, water rights, etc. Each contract provided for the deposit upon the signing of the contract of all of the stock in escrow with the Dexter Horton National Bank of Seattle, Washington, to be delivered upon payment of the purchase price. Each contract provided for the consummation thereof and the delivery of the stock and payment of the consideration on or before June 30, 1927. Upon executing the contracts with Mount Vernon Investment Company and W. R. Morgan, Federal caused audits of the accounts and title examinations of the properties, including those of Home and Skagit, to be made, and prepared to have the properties of Home and Skagit conveyed, along with other properties it had under contract in *182 Washington and Oregon, to its subsidiary which was to operate in those states. On June 6, 1927, Federal caused petitioner to be organized under the laws of the State of Delaware under the name of Oregon-Washington Water Service Company for the purpose of acquiring and operating the water properties to be acquired under the above contracts, which were located in the states of Oregon and Washington. The petitioner was authorized to issue 35,000 shares of stock of which 25,000 shares were preferred stock of no par value and 10,000 shares were common stock of no par value. Federal subscribed on June 6, 1927, for 10,000 shares of common stock of petitioner at $20 per share in cash and owned all of the voting stock of petitioner at all times in 1927, hereinafter mentioned. In October, 1935, petitioner's name was changed to Peoples Water and Gas Company. On June 17, 1927, a special meeting was held by the Board of Directors of Federal. At this meeting, the following transactions took place: The president of Federal was authorized to offer to sell and convey or cause to be sold and conveyed to petitioner the water properties and franchises at Salem and Hillsboro, Oregon, and Vancouver, *183 Washington, and the properties and franchises of the three Washington corporations, Home, Skagit, and Hoquiam, the outstanding stock of which it had under contract of purchase as aforesaid. It was proposed that in consideration of the sale and conveyance of these properties that petitioner pay Federal $1,438,350, in cash, and $245,500 in principal amount of its first mortgage 5 per cent gold bonds, Series A, and 1,015 shares of its preferred stock to be issued to or upon the order of Hoquiam, $153,000 first mortgage 5 per cent gold bonds, Series A, and 631 shares of petitioner's preferred stock to be issued to or upon the order of Skagit, and $124,500 first mortgage 5 per cent gold bonds, Series A, and 515 shares of its preferred stock to be issued to or upon the order of Home, or a total amount of $523,000 first mortgage 5 per cent gold bonds, Series A, and 2,161 shares of preferred stock to be issued upon the order of Home, Skagit, and Hoquiam. The directors of Federal authorized the conveyance of the properties in accordance with this offer, if accepted, and thereafter the dissolution of the three Washington corporations, Home, Skagit and Hoquiam. Also at this meeting the Board *184 of Directors of Federal accepted an offer of Ohrstrom to purchase from Federal the $523,000 principal amount of first mortgage 5 per cent gold bonds, Series A, of petitioner at 88 and the 2,161 shares of preferred stock of petitioner at 84 1/2, to be issued by petitioner to or upon the order of three Washington corporations for the conveyance of their properties to petitioner and to be received by Federal as liquidating dividends from said three Washington corporations. By letter dated June 17, 1927, Federal offered to sell and convey or cause to be sold and conveyed to petitioner, the water properties and franchises at Salem and Hillsboro, Oregon, and Vancouver, Washington, and the properties and franchises of the three Washington corporations, Home, Skagit and Hoquiam, upon the terms stated above. On June 20, 1927, the contract to purchase all of the shares of Home was performed according to its terms, Federal paying $150,000 in cash plus a commission of $3,000 or a total consideration of $153,000. On the same day the contract to purchase all of the shares of Skagit was performed according to its terms, Federal paying $184,000 in cash plus a commission of $3,680 or a total consideration *185 of $187,680. Also, the contract to purchase all of the stock of Hoquiam was performed according to its terms. On June 22, 1927, each of the three Washington corporations, Home, Skagit, and Hoquiam, directed petitioner to issue to or upon the order of Federal the bonds and preferred stock which by the terms of Federal's offer of June 17, 1927, to petitioner, were to be issued to or upon the order of the three Washington corporations. On June 27, 1927, Ohrstrom confirmed its agreement to buy the $523,000 principal amount of petitioner's 5 per cent gold bonds, Series A, and 2,161 shares of petitioner's preferred stock to be received by Federal as liquidating dividends from the three Washington corporations and directed issuance of the stock in the name of A. F. Carney. On June 27, 1927, Federal directed petitioner to issue in bearer form and deliver to or upon the order of Ohrstrom the $523,000 principal amount of its bonds and to issue in the name of A. F. Carney and deliver to or upon the order of Ohrstrom the 2,161 shares of its preferred stock, which it was required to issue pursuant to Federal's offer of June 17, 1927, and the directions of the three Washington corporations. *186 On June 28, 1927, petitioner duly accepted the offer contained in the letter dated June 17, 1927, of Federal. The petitioner's Board of Directors at the meeting held on June 28, 1927, also authorized the issuance of $2,300,000 principal amount of first mortgage 5 per cent gold bonds, Series A, of which $942,000 were authorized to be sold to Ohrstrom for $828,960 cash and an aggregate principal amount of $523,000 were authorized to be issued in accordance with Federal's offer of June 17, 1927. On June 28, 1927, the contracts between Federal and petitioner, the directions of the three Washington corporations and Federal, and the contract between Federal and Ohrstrom were all performed according to their terms. The properties and franchises of the three Washington corporations, Home, Skagit, and Hoquiam, were conveyed to petitioner which issued to Ohrstrom $153,000 principal amount of its first mortgage 5 per cent gold bonds, Series A, and 631 shares of its no par preferred stock, upon orders of Skagit and Federal, and $124,500 principal amount of its first mortgage 5 per cent gold bonds, Series A, and 515 shares of its no par preferred stock upon orders of Home and Federal, and $245,000 *187 principal amount of its first mortgage 5 per cent gold bonds, Series A, and 1,015 shares of its no par preferred stock upon the orders of Hoquiam and Federal. Said bonds and preferred stock were sold by Ohrstrom to the public. Federal received cash from Ohrstrom for said bonds and preferred stock in accordance with its contracts of June 17, 1927, which on June 30, 1927, were credited as follows: Investment in Home
$153,077.50
Investment in Skagit
187,959.50
Investment in Hoquiam
301,807.50 The excess of $77.50 of the credit to Home over its cost of $153,000, and the excess of $179.50 of the credit to Skagit over its cost of $187,680, were carried to Federal's earned surplus account. Pursuant to authorizations granted at meetings of their stockholders held June 29, 1927, proceedings were brought in the Supreme Court of the State of Washington for the dissolution of Home and Skagit resulting in court orders of dissolution entered November 14, 1927. Prior to entering into the contracts of April 15, and 16, 1927, with Federal, and until their performance on June 20, 1927, all the stock of Home and Skagit was owned by Mount Vernon Investment Co., W. R. Morgan, *188 and others, none of whom had any ownership or interest in Home or Skagit or the properties of those companies after June 20, 1927. On November 1, 1939, petitioner sold the Mount Vernon, Burlington and Sedro-Woolley water properties and franchises acquired from Home and Skagit in 1927 for the sum of $300,380.53 and in connection therewith incurred expenses of sale amounting to $11,997.66. The cost basis claimed by respondent, based on the cost to Home and Skagit, or the so-called "old cost basis" for the properties and franchises at Mount Vernon, Burlington and Sedro-Woolley, adjusted for additions at cost and retirements on the old basis to November 1, 1939, was as follows: Depreciable property
$368,975.14
Non-depreciable property
58,569.06
Total cost
$427,543.20
Less accumulated reserve for de-
preciation
89,478.67
Net tax cost
$338,064.53 The loss on the sale at November 1, 1939, computed on the so-called "old basis" was as follows: Cost of non-depreciable property sold / Net cost of all property sold 58,568.06 / 338,064.53 = 17.3245%
Depreciable
Non-depreciable
Total
82.6755%
17.3245%
100%
Net cost property sold
$279,496.47
$58,568.06
$338,064.53
Expense of sale *
9,919.13
2,078.53
11,997.66
Total cost
$289,415.60
$60,646.59
$350,062.19
Proceeds from sale *
248,341.11
52,039.42
300,380.53
Loss on sale
($ 41,074.49)
($ 8,607.12)
($ 49,691.66)
*189 Should the June 28, 1927, cost basis claimed by petitioner of $340,680 based on the transaction in 1927 between Federal, Home, Skagit, their stockholders and petitioner hereinabove described, the so-called "new basis" for the properties and franchises at Mount Vernon, Burlington and Sedro-Woolley, be finally determined to be proper, that basis adjusted for additions at cost and retirements on the so-called new basis, to November 1, 1939, is as follows: Depreciable property
$399,904.47
Non-depreciable property
66,440.18
Total cost
$466,344.65
Less accumulated reserve for de-
preciation
59,424.04
Net tax cost
$406,920.61
The loss on the sale at November 1, 1939, computed on the so-called "new basis" would be as follows: Cost of non-depreciable property sold / Net cost of all property sold 66,440.18 / 406,920.61 = 16.3275%
Depreciable
Non-depreciable
Total
83.6725%
16.3275%
100%
Net cost of property sold
$340,480.43
$66,440.18
$406,920.61
Expenses of sale *
10,038.74
1,958.92
11,997.66
Total cost
$350,519.17
$68,399.10
$418,918.27
Proceeds from sale *
251,335.90
49,044.63
300,380.53
Loss on sale
($ 99,183.27)
($19,354.47)
($118,537.74)
*190 Federal filed a consolidated Federal income tax return for itself and affiliates, including petitioner, for its fiscal year ended May 31, 1928, with the Collector of Internal Revenue for the 2d district of New York. No gain or loss on the transactions in 1927 between Federal, Home, Skagit, their stockholders and petitioner, hereinabove described, was reported in said return. Petitioner filed a separate Federal income tax return for its calendar year 1939 with the Collector of Internal Revenue for the 2d district of New York and reported therein the loss on the sale of its properties at Mount Vernon, Burlington and Sedro-Woolley, hereinabove described. Petitioner used the so-called "old basis" described above in computing its depreciation on the properties at Mount Vernon, Burlington and Sedro-Woolley, until the year 1938, when it claimed a deduction on its 1938 Federal income tax return for depreciation computed on the so-called "new basis" described above. The respondent disallowed the deduction for depreciation computed on the so-called "new basis" and after protest by petitioner and hearing before the Technical Staff the petitioner *191 agreed to the deficiency in tax for 1938 resulting from the disallowance of the depreciation computed on the so-called "new basis." All of the transactions which Federal entered into commencing with the signing of the contracts for the purchase of the stocks of Home, Skagit and Hoquiam, in April, 1927, through the conveyance of their properties to petitioner on June 28, 1927, were interrelated and interdependent, and were steps in a plan to acquire the physical properties of these companies and to convey them to petitioner. Opinion Petitioner contends that the purchase by Federal of the stock of Home and Skagit and the subsequent transfer of their physical properties to petitioner was, in substance, a purchase by petitioner for cash of the physical properties of Home and Skagit. It argues that each and every step in the transaction commencing with the signing of the contract for the purchase of the stock of the three Washington companies, including Home and Skagit, by Federal, were all interrelated and interdependent and part of a preconceived plan to acquire the physical properties of these companies and to place the ownership of their property in Federal's subsidiary, the petitioner, *192 who was to operate them. So viewed, petitioner maintains that it did not acquire the property of Home and Skagit pursuant to a plan of reorganization. Petitioner contends, therefore, that the cost basis to it of the properties of Home and Skagit was the amount paid in cash by Federal for the stock of Home and Skagit, or the value of the securities issued by petitioner therefor. Respondent, on the other hand, contends that the petitioner acquired the property of Home and Skagit pursuant to a reorganization under section 203(h)(1) of the Revenue Act of 1926, and that the basis for depreciation and for determining gain or loss is the same basis that such properties had in the hands of the original predecessor owners, Home and Skagit, as required under sections 114, 113(b) and 113(a)(12) of the Internal Revenue Code, and section 113(a)(7) of the Revenue Act of 1932. It is well recognized that where a series of transactions were in fact merely steps in carrying out a definite pre-conceived purpose, the object sought and obtained must govern and the integrated steps used in effecting the desired result may not be treated separately for tax purposes either at the *193 instance of the taxpayer or the taxing authority or by agreement between both. Koppers Coal Co., 6 T.C. 1209; Illinois Water Service Co., 2 T.C. 1200; Commissioner v. Ashland Oil & Refining Co., 99 Fed. (2d) 588; certiorari denied, 306 U.S. 661; Prairie Oil & Gas Co. v. Motter, 66 Fed. (2d) 309; Tulsa Tribune Co. v. Commissioner, 58 Fed. (2d) 937; Anheuser-Busch, Inc., 40 B.T.A. 1100; affirmed, 115 Fed. (2d) 662; certiorari denied, 312 U.S. 699; Ahles Realty Corporation v. Commissioner, 71 Fed. (2d) 150; certiorari denied, 293 U.S. 611. It is a general rule that taxation is a practical matter dealing not with mere form but rather with the realities. Commissioner v. Court Holding Co., 324 U.S. 331; Meurer Steel Barrel Co. v. Commissioner, 144 Fed. (2d) 282; certiorari denied, 324 U.S. 860; Allen v. Trust Company of Georgia, 326 U.S. 630. As we pointed out in the Illinois Water Service Co., supra, "It is, therefore, the situation at the beginning and end of the transactions to *194 which we must look and determine whether there has been a reorganization within the meaning of the statute, or merely a sale or taxable exchange.' The answer therefore to the contentions herein depends primarily upon a question of fact, namely, whether Federal in acquiring the stock of Home and Skagit did so, not with the purpose of making an investment in such stock, but as a step in a plan to acquire the physical properties of these companies, and if so, whether that plan was followed and the later transactions where ownership of the physical assets was placed in a subsidiary corporation organized to operate the properties, were transactions carrying out the pre-conceived plan. The cited case of Illinois Water Service Co., supra, upon which petitioner relies, has many features of resemblance to those in the instant proceeding. In that case the Consumers Public Service Company was a holding company, and all of its authorized and outstanding common stock was owned by three individuals, namely, Edwin J. Smail, Claude F. Baker, and William J. Walsh. It owned all except 50 shares of the common stock of Freeport Water Company, an Illinois corporation. The Freeport Water *195 Company owned the water plant and system at Freeport, Illinois. The W. B. Foshay Company had organized Peoples Light and Power Corporation (Peoples) in March of 1926, and Foshay owned the controlling stock of Peoples. An agreement was executed whereby Foshay purchased from Smail, Baker, and Walsh all of the stock of Consumers. The agreement provided that the physical properties of Freeport were to be sold to Foshay or its nominee. Thereafter Foshay and Peoples entered into an agreement under which Foshay agreed to purchase various securities of Peoples, and in payment Foshay agreed to deliver to Peoples the capital stock and first mortgage bonds of the corporation to which Foshay would cause to be transferred various plants and properties including the property of Freeport. Foshay caused Peoples Utilities Illinois Corporation (Peoples Illinois) to be organized and offered to subscribe to its stock and to purchase its first mortgage bonds and to pay for the same by causing the properties of Freeport to be conveyed to Peoples Illinois subject to authorization of the Illinois Commerce Commission. Foshay made an offer to Freeport which recited that Foshay had entered into an agreement *196 to acquire all of the capital stock of Consumers and that upon the capital stock of Consumers and that upon the consummation of that contract Foshay would be the owner of Freeport's capital stock, and that Foshay desired that Freeport's property should be transferred to Foshay or its nominee, after which steps would be taken to dissolve Freeport and Consumers. In contemplation of such results Foshay submitted a proposal to Freeport which was accepted, whereby Freeport was to transfer to Peoples Illinois its water plant, distributing system, and franchises and was to transfer to Foshay all other property consisting of cash, accounts receivable, etc. It was also agreed that upon the transfer of the Freeport property to Peoples Illinois, Freeport would be dissolved. All of the contracts were closed on November 15, 1926, after approval had been obtained from the Illinois Commerce Commission. At the closing, Foshay paid the above individual stockholders of Consumers for their stock, and also provided funds for the satisfaction of the indebtedness of Consumers and its subsidiaries, all in accordance with the agreement. Freeport conveyed its physical properties to Peoples Illinois as Foshay's *197 nominee, and its other assets consisting of cash, notes, etc. to Foshay. Peoples Illinois issued its bonds and stock which were transferred by Foshay to Peoples, and Peoples issued its securities to Foshay. Subsequently, Consumers and its subsidiaries, including Freeport, were dissolved. We found that all of these transactions which Foshay entered into on August 16, 1926, were interrelated and interdependent and were steps in a single plan and were undertaken to accomplish the transfer of all of the properties of Consumer's subsidiaries to Foshay, or its nominee. We pointed out that at the beginning of the transactions the Freeport property was owned by Freeport whose stock was owned by Consumers whose stock in turn was owned by Smail, Baker, and Walsh, and at the end of the transactions the Freeport property was owned by Peoples Illinois whose stock was owned by Peoples; and that, therefore, none of the interest at the beginning carried through to the end of the transaction, and there was not the continuity of interest in the same persons required for a reorganization. We said that: "The entire transaction was essentially in intent, purpose, and result a purchase of the Freeport *198 property by Foshay itself, or by Foshay for a nominee." We held that such a purchase for cash was outside the purposes of the reorganization provisions of the statute. In the instant proceeding the facts are very similar to those in the Illinois Water Service Company case. The facts in this proceeding show that there was a pre-conceived plan of Messrs. Chenery and Ohrstrom to build up a water service company system with Federal as the parent holding company of wholly owned operating subsidiaries in the various states. This purpose was to be accomplished by acquiring water properties directly or through the acquisition of stocks of existing water companies and conveying the properties to a newly organized subsidiary of Federal. Federal, under this general plan, entered into contracts in April, 1927, to purchase directly for cash, certain water properties and franchises in Oregon and Washington and all of the stock of three Washington corporations, Home, Skagit, and Hoquiam, which owned water properties in Washington. Upon the execution of the contracts, Federal caused audits of the accounts and title examination of the properties, including those of Home and Skagit, to be made, and *199 prepared to have these properties conveyed to its subsidiary which was to operate in those states. On June 6, 1927, Federal caused the petitioner to be organized under the name of Oregon-Washington Water Service Company, for the purpose of acquiring and operating the water properties to be acquired under the above contracts. On June 17, 1927, Federal offered to sell and convey, or cause to be sold and conveyed to petitioner the water properties and franchises of Home and Skagit for petitioner's preferred stock and first mortgage bonds. At the same meeting, Federal's directors agreed to sell to Ohrstrom the bonds and preferred stock which constituted the consideration to be paid by petitioner for the conveyance of the properties of Home and Skagit. Also, at the same meeting the directors of Federal authorized the dissolution of the three Washington companies, including Home and Skagit. On June 20th, Federal performed its contracts and purchased the stocks of the three Washington corporations, including Home and Skagit, for cash, and thereafter the stockholders of these companies had no interest in them after June 20th. On June 28, 1928, the properties which Federal had under contract *200 together with properties of Home and Skagit, were conveyed to petitioner. Some cash was paid to Federal and the preferred stock and bonds called for by the agreement for the conveyance of the properties of Home and Skagit to petitioner were issued to Ohrstrom and sold to the public, and the cash proceeds thereof were paid to Federal. Thus, at the beginning of the transactions the water properties of Home and Skagit were owned by these corporations whose stock was owned by the Mount Vernon Investment Co., W. R. Morgan, and others. After the transactions were completed neither the stockholders of Home and Skagit nor Federal received any interest for the transfer of the property to petitioner, so that there is not the continuity of interest in the transferred property required for a reorganization. United Light & Power Co. v. Commissioner, 105 Fed. (2d) 866; certiorari denied, 308 U.S. 574; Bassick v. Commissioner, 85 Fed. (2d) 8; certiorari denied, 299 U.S. 592; Halliburton v. Commissioner, 78 Fed. (2d) 265. We think that considering all of the transactions together, the object and purpose planned and accomplished was a *201 purchase for cash of the property of Home and Skagit by Federal. We hold, therefore, that the petitioner did not receive the property of Home and Skagit pursuant to a reorganization within section 203(h)(1) of the Revenue Act of 1926. Commissioner v. Ashland Oil & Refining Co., supra; Prairie Oil & Gas Co. v. Motter, supra; Illinois Water Service Co., supra; Koppers Coal Co., supra; Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462. Since the transactions did not constitute a reorganization, the basis of the property is not established by section 113(a)(7) of the Revenue Act of 1932, i.e., the basis to petitioner is not the same as the basis to Home and Skagit. The next question for our consideration is what is the basis of the property to petitioner. The parties have stipulated that if we agree with petitioner's contention that the transactions here did not result in a reorganization, and that Federal in buying the stock of Home and Skagit in substance purchased the property for cash, then the cost basis of the property adjusted for additions and retirements to the date of sale on November 1, 1929, was *202 a total cost of $460,344.65 less accumulated reserve for depreciation of $59,324.04 leaving a net tax cost of $406,920.61 or the so-called "new basis" referred to in our findings of fact. It was also stipulated that the loss on the sale of the property was as follows: Depreciable property $99,183.27, non-depreciable property $19,354.47, or a total of $118,537.74. Effect will be given to these stipulations in a recomputation under Rule 50. Decision will be entered under Rule 50. Footnotes
*. Allocated on above percentages.↩
*. Allocated on above percentages.↩